66 A.3d 1152

**EDGEWOOD MANAGEMENT CORPORATION**

v.

**Donna JACKSON.**

**No. 76, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

May 30, 2013.

Yoora Pak, (Katherine M. Barrett, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, on the brief), McLean, VA, for Appellant.

Nicholas W. Woodfield, (R. Scott Oswald, The Employment Law Group, PC, on the brief), Washington, D.C., for Appellee.

Panel: DEBORAH S. EYLER, KEHOE, and JAMES A. KENNEY, III, (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

In the Circuit Court for Montgomery County, Donna Jackson, the appellee/cross-appellant, brought a retaliation action pursuant to Md.Code (2009 Repl.Vol., 2010 Supp.), section 20–1202 of the State Government Article ("SG"), asserting a violation of section 27–19(c) of the Montgomery County Code ("MCC") against Edgewood Management Corporation ("Edgewood"), the appellant/cross-appellee, her former employer. Jackson alleged that Edgewood had constructively terminated her employment in retaliation for reporting a sex discrimination complaint made by a subordinate. She sought compensatory and punitive damages, as well as attorneys' fees.

Jackson's case was tried to a jury. On a special verdict form, the jury found in favor of Jackson, awarding her $500,000 in "economic damages" and $150,000 in "compensatory damages."[1] The court entered judgment in Jackson's favor for $650,000 ("the Judgment").

Edgewood filed a ten-day motion to amend the Judgment to "conform with the [MCC]" and a motion for judgment notwithstanding the verdict ("JNOV"). Jackson filed a post-judgment memorandum addressing her entitlement to punitive damages.[2]

The court denied Edgewood's motion for JNOV and granted its motion to amend the Judgment to conform with the MCC. The court entered an amended judgment reducing the verdict

---

1. It was apparent at trial that "economic damages" meant lost wages and "compensatory damages" meant non-economic damages, *i.e.,* pain and suffering.

2. Jackson also petitioned for an award of attorneys' fees. Her petition was granted in part and denied in part subsequent to the appeal and cross-appeal in this case. The propriety of that award is not before us.

to $89,195, comprised of back-pay for two years minus the amount of unemployment benefits collected by Jackson during that time ("the Amended Judgment").

Edgewood noted an appeal, presenting five questions for our review, which we have condensed and rephrased as two:

I. Was the evidence at trial legally insufficient to sustain Jackson's retaliation claim?

II. Did the trial court err or abuse its discretion in declining to submit Edgewood's proposed special verdict sheet to the jurors?

Jackson noted a cross-appeal, presenting four questions for review, which we have condensed and rephrased as three:

I. Are the remedies for a retaliation action brought pursuant to SG section 20–1202 limited to those set forth in MCC section 27–8?

II. May economic damages for retaliatory discharge be offset by the amount of unemployment benefits the employee collected?

III. Did the trial court abuse its discretion in declining to instruct the jurors on punitive damages?

For the reasons to follow, we answer all the questions in the negative. Accordingly, we shall vacate the Amended Judgment and reinstate and affirm the original Judgment of the circuit court.

## FACTS AND PROCEEDINGS

Except where noted, we present the facts in a light most favorable to Jackson, the prevailing party below.

Edgewood is a property management company headquartered in Germantown. It manages numerous properties throughout Maryland, including Glenview Garden Apartments ("Glenview") in Glen Burnie. Glenview is a 204–unit, low-income apartment complex subject to regulations by the Department of Housing and Urban Development ("HUD"). It is owned by Triton Advisors, Inc. ("Triton"), a corporation owned and operated by one Janet Charlton.

Triton had purchased Glenview with a "Section 236 loan," a low-interest loan insured by the federal government under the National Housing Act, 12 U.S.C. § 1715z–1. In the loan agreement, HUD set the income limits for tenants in the property. *See U.S. ex rel. K & R Ltd. P'ship v. Mass. Housing Finance Agency*, 530 F.3d 980, 981 (D.C.Cir.2008) (discussing Section 236 loans). Only 10% of the units in a Section 236 property can be rented to "market renters," that is, tenants with incomes above 80% of the area median income, as determined by HUD.

In 2007, Triton began the process of transitioning Glenview from a Section 236 property to a Low Income Housing Tax Credit ("LIHTC") property. LIHTC is a federal tax-incentive program designed to encourage private development of low income properties. *See Carter v. Maryland Mgmt. Co.*, 377 Md. 596, 603, 835 A.2d 158 (2003). Under this program, a property owner will receive a tax credit if a certain minimum number of residential units in the property are rent-restricted and occupied by people whose incomes do not exceed "sixty percent of the area median income," as determined by HUD. The property owner then can sell the tax credit to investors to raise capital for improvements to the property.

Jackson has been employed by Edgewood since 1979. From 1990 until her resignation on March 25, 2010, she held the position of community manager for Glenview. At the time of her resignation, she was earning approximately $55,000 annually.

As community manager, Jackson was responsible for the day-to-day operations of Glenview, including collecting rent, handling resident complaints and maintenance requests, and reviewing and approving rental applications. Jackson supervised one employee, Paula "Drema" Wagner, a leasing specialist at Glenview, whom Jackson hired in 1990. Art Wilcoxen was Glenview's groundskeeper.

Before 2009, Jackson's supervisor was Lisa Davis, an assistant vice-president with Edgewood. During much of that time, Scott Jones was the regional vice-president who super-

vised Davis. He has since become Edgewood's president and chief executive officer. Jackson received uniformly positive performance evaluations from Davis and Jones.

In September of 2009, Arturo "Art" Reyes replaced Davis as Jackson's direct supervisor. Reyes reported to Norman Azouqha, a regional vice-president who, in turn, reported to George Caruso, Edgewood's executive vice-president and chief "knowledge officer."

On or about December 7, 2009, Larry Davis, a senior vice-president at Edgewood, and Terrance Kelly, an assistant vice-president at Edgewood, called Wagner and offered her a promotion to the position of community manager at an apartment complex in Capital Heights that Edgewood managed. Wagner declined the promotion for several reasons, including the length of the commute and safety concerns. Wagner had been living in Glen Burnie for decades, near Glenview. Capital Heights is in Prince George's County, about 36 miles from Wagner's home, and in a neighborhood with a high crime rate.

On December 10, 2009, Reyes came to Glenview to discuss a tenant complaint with Jackson and to inform Art Wilcoxen, the groundskeeper, that his position was being eliminated.

Reyes met with Jackson in her office, which was located at the back of Glenview's rental office. He advised Jackson that a tenant, one Mary Barnes, had filed a complaint with the Maryland Commission on Human Relations ("MCHR") alleging that Jackson had discriminated against her on the basis of her race by failing to handle her maintenance requests promptly. Jackson responded by telling Reyes that Barnes was a problem tenant and offering to show Reyes Barnes's lengthy tenant file, which documented frequent complaints made by her and by other tenants about her. Reyes asked to see maintenance requests made by Barnes, took certain of the records, and said he would look into the matter.

Reyes asked Jackson to call Wilcoxen to her office, which she did. In Jackson's office, with the door shut, Reyes informed Wilcoxen that his position was going to be eliminated

on an uncertain date in the future, for budgetary reasons. Reyes said he had wanted to give Wilcoxen a "heads up."

Following this conversation, Wilcoxen walked out of Jackson's office and into the front reception area, where Wagner's desk was located. Reyes and Jackson followed him out. Also in the reception area were Rick West, Edgewood's maintenance supervisor; Penny Ingold, another Glenview employee; a tenant; and a new rental applicant.

Wilcoxen walked over to Wagner's desk and told her he had just been laid off. Reyes then approached Wagner's desk. He said, "oh, [I heard] you didn't take the job transfer." He sat down in front of Wagner's desk and asked her why she had declined the transfer. Wagner replied, giving the reasons discussed above. Reyes told her, "well, due to the fact you didn't take the transfer, we're cutting your pay from [$]18 [per hour] down to [$]13 [per hour]." Wagner asked Reyes why her pay was being cut and when this change would go into effect. Reyes simply repeated his previous statement that her pay would be cut.

A tenant then walked into Glenview's office. Wagner tried to get Reyes to "stop speaking." Wagner said, "excuse me," and began attempting to assist the tenant. Nevertheless, Reyes continued to "repeat[ ] what he [had] said," announcing to Wagner that it was a "a new day," and budgets were being cut.

At this point, Wagner was near tears. Jackson, who, like everyone in the vicinity, had overheard Reyes talking to Wagner, approached Reyes and asked if he'd like to use her office to continue his conversation with Wagner. Reyes declined, saying "we're almost finished here." He then walked into Jackson's office, collected his belongings, and left.

Immediately after Reyes departed, Wagner reported to Jackson that she believed Reyes had discriminated against her on the basis of her gender by speaking privately to a male employee (Wilcoxen) about his job being eliminated but speaking to her about a significant reduction in her pay in front of numerous employees and tenants. Wagner was extremely

upset. Jackson tried to console her, remarking that she "didn't know why [Reyes] did that."

Later that day, Wagner sat down with Jackson and Wilcoxen to discuss the incident a second time. She expressed the view to both of them that Reyes had "discriminated against [her] because [she] was a woman." After leaving work for the day, Wagner remained "upset" about the incident with Reyes. She typed a letter ("the Grievance Letter") that summarized her encounter with Reyes that day:[3]

> I Drema Wagner was offered a new position [Community Manager] at another property. I declined the offer to due to having to travel & work at a bad area. I would have to travel 1 hr to 1½ hrs one way. I chose to work at Glenview due to I only live 10–15 minutes away, the money I was offered would not even cover my gas expenses. This position was offered to me by Larry Davis & Terrance Kelly.
>
> On Thursday 12/10/2009 Art Reyes, Ms. Jackson supervisor told me due to I declined the job transfer my pay would properly be cut/decreased by $ 5.00 per hour. I ask Mr. Reyes why, Mr. Reyes stated this was a new day, there were budget cuts. Mr. Reyes was explaining this to me in the front office while I was answering the phone & waiting on residents and a co-worker come in and Mr. Reyes kept discussing my personal business. In order to get Mr. Reyes to stop, I turned to my co-worker spoke to her then turned back to look at Mr. Reyes he paused & continued discussing my personal business.
>
> I feel Mr. Reyes should have requested me to go to a private close area to discuss my personal business. I also feel the real reason my current pay maybe cut/decreased because I would not accept the new position.

The next day, Friday, December 11, 2009, Wagner gave Jackson the Grievance Letter. Jackson initialed it and marked it as "received 12/11/09."

---

3. We have not made any corrections to the Grievance Letter.

On Tuesday, December 15, 2009, Jackson called Reyes's supervisor, Azouqha, to report Wagner's grievance. She advised him that Wagner had "written a discrimination letter against Mr. Reyes" and explained what had happened. She told him that Wagner had said that "she felt she was discriminated against, because of her gender." Jackson also discussed with Azouqha a conflict she had had with Reyes concerning a repair to Barnes's apartment.

At the end of the conversation, Jackson asked Azouqha whether she should "forward [the Grievance Letter] to [him], or send it to HR." Azouqha replied that Jackson should put the letter in Wagner's file and to just try to "get along" with Reyes "until the rehab is over with" (referring to renovations to Glenview that were being undertaken).

Jackson followed Azouqha's directive and placed the Grievance Letter in Wagner's file. She also wrote a contemporaneous note "to document the employee file of Ms. Drema Wagner." It stated:

> On 12/15/09 at approximately 11:45 a.m., I, Donna L. Jackson, Com. Mgr. for Glenview, called Mr. Norman Azouqha to inform him of a grievance letter Ms. Wagner wrote concerning the transfer offer or possible pay decrease from Mr. Art Reyes. I asked Mr. Azouqha if he wished me to send him a copy through e-mail and send to HR. Mr. Azouqha told me no and to place it in her employee file. I did as such.

Jackson also made a note in a journal she kept to record events for work. This note stated:

> 12/15/09 I called Mr. Azouqha and told him Mr. Reyes had Rick and 2 men from another property go to 76–101's [Barnes's apartment] bathroom and cut out the ceiling when there was no leak nor did the resident ever call in a leak and this to me didn't look good for Glenview's staff and could possibly hurt the complaint [Barnes] filed. I also told Mr. Azouqha Drema had written a complaint about Mr. Reyes due to she was embarrassed on how Mr. Reyes

discussed her personal business in the front office with residents and a fellow employee present.

That same day, Jackson told Wagner that she had informed Azouqha of Wagner's complaint and that he would "take care of it." Based on her long history with Azouqha, Jackson felt certain that Azouqha would "discuss it with Mr. Reyes."

On December 29, 2009, Glenview received final approval as an LIHTC property.

Approximately one month after Jackson reported Wagner's grievance, on Saturday, January 16, 2010, at 1:23 a.m., Reyes sent an e-mail to Azouqha and Caruso, attaching a draft disciplinary memo against Jackson. The draft memo cited three instances of misconduct by Jackson that warranted disciplinary action. The first instance concerned acceptance of tenants who did not satisfy the income eligibility requirements for Glenview to be an LIHTC property. In particular, Reyes stated that "Jackson took upon her own to approve and move several applicants to units restricted by income limits and whose incomes were over the allowable incomes under HUD's rules and regulations." The second two instances of misconduct concerned information Reyes claimed to have learned in investigating the Barnes race discrimination complaint. Reyes stated that his investigation revealed that, in managing Glenview, Jackson had not met Edgewood's policy of providing corrective maintenance to tenants within 48 hours of receiving a complaint; instead, in the past year, maintenance work orders at Glenview had averaged between six to seven days for completion. Reyes further stated that he was of the view that Jackson had lied to an attorney representing Edgewood in the Barnes case when she told the attorney that after Barnes complained of a leak in her apartment the Glenview maintenance staff inspected Barnes's apartment and did not find any leaks. According to Reyes, he dispatched a quality control team to Barnes's apartment and, as Jackson knew, the team discovered a leaking overflow gasket in the bathtub in the apartment above Barnes's bathroom. Reyes's draft disciplinary memo stated that disciplinary action was

required due to these "recent incidents and findings" and advised Jackson that the memo served as her "final warning" and that she would need to "immediate[ly] improve [her] unsatisfactory performance" or face "further disciplinary action, up to and including termination of employment." The memo closed by stating that Jackson's "work performance ha[d] been of poor and careless performance [sic]" and that "her neglect of duty and misleading of facts could put the owners and the company at risk."

In the e-mail to Azouqha and Caruso attaching the draft disciplinary memo, Reyes stated that the offenses described in the draft memo "could be enough for a termination of employment."

Caruso replied to Reyes's e-mail two days later. He praised Reyes's "initial work up," but disagreed that termination was appropriate as this was the first time Jackson had been disciplined. Caruso suggested they look into transferring Jackson and "watch [Jackson] closely going forward." He also made some edits to the draft disciplinary memo, including a note directing Reyes to add the names of the market tenants referenced in the memo.

Two days later, on January 21, 2010, Reyes e-mailed Jackson with a number of questions. As relevant here, Reyes commented that three "move ins" in 2009 had been "over the 80% income limits"; named the three market tenants; and asked whether there had been any other market tenants approved since that time.

In a reply e-mail sent that day, Jackson told Reyes that the three market tenants to whom he had referred all had been approved before Davis, who, as mentioned, was Jackson's former supervisor, had directed her by e-mail not to move in anyone else at "Market Rent." Jackson further stated that no additional market tenants had been approved since that time.

Reyes responded by asking Jackson to forward to him the income limits Davis had provided her and the "e-mail in which she [*i.e.*, Davis] indicates that no one should move in at market rent." Jackson did so.

On January 25, 2010, Azouqha hand-delivered to Jackson a Disciplinary Action Memorandum. Reyes and Azouqha were listed as the authors and it was copied to Caruso. It was nearly identical to Reyes's draft disciplinary memo, but incorporated certain of Caruso's edits and suggested changes. It closed by advising Jackson that her performance would be re-evaluated in 30 days and listing seven areas in which she needed to improve her performance.

Three days later, Jackson sent a memorandum addressed to Reyes, Azouqha, and Caruso, and copied to Jones, rebutting the charges in the Disciplinary Action Memorandum. With respect to market tenants, Jackson explained that she always had complied with the directives she had received from her supervisors regarding income limits for tenants and that the three market tenants in question had been approved in compliance with the directives in effect at that time. Moreover, she asserted that Glenview had been the subject of numerous "audits and reviews" and she "never [had] been told [Glenview] was not in compliance with the income limits." With respect to completion of repairs, Jackson stated that the maintenance records Reyes had reviewed reflecting that work orders had taken between five to six days on average to complete were not accurate, due to a data-entry error on her part, which she would correct going forward. Specifically, when closing out work orders using Edgewood's computer software, she had not changed the completion date. As a result, the completion date reflected the date she had entered a work order as "completed" in the computer, not the date it actually had been completed. With respect to Barnes's complaints, Jackson explained Barnes's history as a "problem resident." Finally, Jackson denied ever lying to an attorney representing Edgewood in the Barnes discrimination matter.[4]

Jackson's memorandum concluded as follows:

---

4. Jackson explained that when Reyes came to Glenview on December 10, 2009, he had asked her to check the status of any outstanding maintenance requests made by Barnes. She had done so and found no open requests. That same day, Reyes met with Barnes in her apart-

In closing, I would like to thank you for your time in going over my responses to all the above accusations. *There may be other reasons as to why Mr. Reyes found it necessary to put in writing these accusations however at this time I wish not to discuss.*

After your investigation I hope your findings will prevail this should and will be removed from my employee file.

I assure you, I will continue to be as I have always been an asset to Glenview Gardens as well as being a dedicated, honest and responsible employee.

(Emphasis added.)

On February 1, 2010, Jones e-mailed Reyes and Azouqha and directed them to prepare a "response for [his] signature." He copied his e-mail to Caruso. Caruso replied that he wished to sit down with Reyes and Azouqha to discuss their response, explaining that because Jackson was "trying to deny responsibility," it was important that they reply "factually, and carefully."

On February 5, 2010, Reyes e-mailed Charlton. He advised her that Jones had directed him to "move on implementing the plan to change the staff at Glenview" and he was seeking her approval for the planned changes. He stated that, at that time, they did not have "enough to do a termination" of Jackson, but were planning to transfer her to another Triton-owned property, Glenarden, because that property could "ab-

---

ment with regard to her discrimination complaint. While there, he observed a "bulging ceiling" in her bathroom. He asked Jackson to send West, Edgewood's maintenance supervisor, to check it out. Jackson issued a work order and West inspected the ceiling. He reported back to Jackson that the bulging ceiling was due to a previous repair, but was not caused by a current leak. Nevertheless, four days later, Reyes asked two other maintenance workers to accompany him and West to Barnes's apartment to check for a leak. Reyes directed them to cut through the bulging drywall to check for a leak. None was found.

Reyes then directed the maintenance workers to go to the apartment above Barnes's and open the access panel while splashing water inside that tenant's bathtub. The workers were then able to see "water dripping off." As a result, they were directed to replace an overflow gasket and a shower diverter.

sorb her salary." Charlton replied three days later, copying Jones, saying that while she was "anxious to get a LIHTC certified manager at Glenview," it did not seem fair to transfer Jackson to another Triton property in order to "absorb" her salary. She sought a meeting to discuss the matter further.

The following day, February 9, 2010, Jones e-mailed Charlton, explaining that Glenarden was the only possible property to which he could transfer Jackson.[5] He further stated:

> Please know that we are on the path to terminating Donna's employment but don't have enough hard evidence as of today to make it happen. There is one write up in the file and another is being worked on. However, over the next few weeks, I believe that we will have what we need. Her time at Glenarden would be short. In addition, I have a strong feeling that she may resign when we announce the transfer to her. Her world does not extend beyond Glen Burnie.

Charlton responded that if the transfer was to occur, Jackson's salary would have to be reduced.

On February 24, 2010, Reyes sent Jackson a response memorandum, rejecting each of her explanations and concluding that the disciplinary action was appropriate. The response memorandum further advised Jackson that she was being transferred to the position of community manager for Glenreed Apartments and Charles Landing Apartments. Charles Landing is located in northern Virginia, 34 miles from Jackson's home. Glenreed is located 36 miles from Jackson's home in the opposite direction. Her salary was to be decreased by $5,000 annually "to reflect [her] new responsibilities and to adhere to the approved budget." The stated reason for this transfer was that Glenview recently had be-

---

5. Jones explained that "in order to transfer [Jackson]" he had to replace her with an LIHTC-certified manager and that Glenarden was the only property within "reasonable commuting distance" with a certified manager.

come an LIHTC property and Jackson had not passed her LIHTC certification test.[6]

Also on that day, Reyes met with Wagner to inform her that the pay cut he previously had discussed with her was going to take effect immediately.

The next day, Jackson and Wagner both submitted letters of resignation. Jackson's letter was sent to Reyes, Azouqha, Caruso, Jones, and Charlton. It stated:

> After 31 years of dedicated service to Glenview Garden Apartments it brings me great sadness that due to an unnecessary job transfer I am being forced to take which I feel has been brought on by retaliation, I must resign.
>
> This will serve as a thirty day notice that my last day will be March 25, 2010.
>
> I have elected to give a thirty day notice instead of the normal two weeks due to the property is currently under rehab and I want the owner to have time to find someone else to fill my position.

Wagner's letter was sent to Jackson, Reyes, Azouqha, Jones, and Charlton. It described the December 10, 2009 incident with Reyes, her Grievance Letter, the fact that Jackson had reported her grievance to Azouqha, and that Azouqha had directed Jackson not to forward the Grievance Letter to him or to HR.

On February 29, 2010, Azouqha and Reyes each responded to Wagner's letter of resignation. In Azouqha's response, he accepted Wagner's resignation and stated that he "was never aware nor I have [sic] received any complaint referencing your

---

**6.** Jackson had taken LIHTC certification classes, but had failed the exam. As of February 4, 2010, it was Edgewood's policy that all community managers at "affordable" properties obtain an "approved industry designation" evidencing their successful completion of a training exam. Current employees were expected to be "actively in the process of achieving an appropriate industry designation."

Charles Landing also was an LIHTC property and Glenreed was being "positioned" to become an LIHTC property.

allegations that Art Reyes met with you in the front office."
He also denied having any knowledge of her Grievance Letter.

In Reyes's response, he acknowledged having discussed
Wagner's transfer in the reception area, but said that Wagner
had initiated the conversation by telling Reyes she had de-
clined the transfer. Reyes claimed that he had been unaware
that Wagner even had been offered a transfer prior to that
time. He denied having spoken to Wagner about a reduction
in her salary in the reception area at Glenview. He stated
that he had met with her privately in Jackson's office to
inform her of the salary cut and again on February 24, 2010,
when he had told her the salary reduction was to become
effective.

Jackson's last day was March 25, 2010.

On September 3, 2010, Jackson filed her circuit court com-
plaint asserting one count of retaliation against Edgewood
pursuant to SG section 20–1202, for a violation of MCC section
27–19(c). She alleged that she had opposed an act of sex
discrimination by reporting Wagner's grievance to Azouqha
and that Edgewood had retaliated against her for doing so by
initiating a disciplinary action against her, transferring her,
and decreasing her salary. She further alleged that these
actions amounted to a constructive discharge. She sought
compensatory and punitive damages and attorneys' fees.

The case was tried to a jury over five days in September of
2011. At that time, Jackson was 54 years old. She testified
and called seven lay witnesses: Reyes, Caruso, Azouqha,
West, Wagner, Wilcoxen, and Jones. Reyes and Azouqha
each denied having any knowledge of Wagner's complaint of
discrimination when they disciplined Jackson. Caruso testi-
fied that he believed Reyes had become aware of Wagner's
complaint in March of 2010. He acknowledged, however, that
he had testified in deposition that Reyes had learned of
Wagner's complaint in December of 2009. Jones testified that
he first became aware of Wagner's complaint when Wagner
and Jackson submitted their letters of resignation.

Jackson introduced into evidence e-mail correspondence from February 2010 between Jones, Caruso, Reyes, and Azouqha reflecting that they knew when they decided to transfer her and reduce her salary that she would likely resign as a result. She also introduced into evidence Barnes's tenant file and internal Edgewood email correspondence demonstrating that she had received conflicting directives from Davis and Jones regarding whether she could approve market tenants in the year prior to her discharge.

Jackson also called three expert witnesses. Phillip Bussey, Ph.D., was accepted as an expert in the fields of vocational rehabilitation, vocational assessment, and vocational counseling and opined that it would take Jackson at least two to three years to find employment commensurate with the work she had performed at Edgewood and that, if she had not found a job in that time period, she might never find an equivalent job given her age and the length of her period of unemployment. Richard Edelman, Ph.D., was accepted as an expert in economics and finance. He opined that if Jackson were unable to find suitable replacement employment, she would sustain economic losses of $568,912. Finally, Liza Gold, M.D., a psychiatrist, opined that Jackson suffered from an "adjustment disorder with depressed mood" as a result of Edgewood's actions in disciplining and constructively discharging her.

At the close of Jackson's case, Edgewood moved for judgment. It argued that Jackson had failed to prove that she held an objective, good faith belief that Reyes had engaged in discrimination when she made her report to Azouqha in December of 2009. This was so because neither the Grievance Letter nor Jackson's contemporaneous notes documenting her conversation with Azouqha mentioned discrimination. Edgewood further argued that there was no evidence of an adverse action against Jackson because it had offered her a lateral transfer with a slight pay decrease. Finally, Edgewood argued that Jackson failed to prove that any adverse action was caused by a report of discrimination because the ultimate decision maker, Jones, had no knowledge of Jackson's report at the time he approved her transfer and salary decrease.

The court denied the motion for judgment.

In its case, Edgewood recalled Reyes, Azouqha, and Jones, and called Charlton and the director of Edgewood's compliance division. Charlton, who as mentioned owned and operated Triton, testified that in the spring of 2009 she discovered that 99 of the 204 units at Glenview were occupied by market renters. As a result, those 99 units would not be eligible for LIHTC tax credits, representing a loss to Triton of $1,000,000 in "tax credit investment equity." Charlton stated that, after learning this information, she discussed the issue with Davis (Reyes's predecessor) and with Jones. Charlton was "insistent" that Glenview have a "tax credit certified" community manager because she expected that Triton's investor would want a certified manager in place. She also testified that she told Jones that Edgewood would need to eliminate a position at Glenview.

Edgewood introduced into evidence a budget that Jones testified he prepared in August 2009. The budget showed a reduction in Wagner's salary from $18 per hour to $13 per hour; that Jackson's salary would not increase in 2010; and that Wilcoxen's position would be eliminated. Jones stated that these budgetary changes were implemented in February 2010.

At the close of all the evidence, Edgewood renewed its motion for judgment on the same grounds previously raised. Edgewood further argued that it had presented evidence of legitimate non-discriminatory reasons for its employment actions. The motion was denied.

On September 26, 2011, the case was sent to the jury on a special verdict form. (We shall discuss the verdict form in more detail, *infra.*) As noted, the jurors returned a verdict in favor of Jackson, awarding her $500,000 in "economic damages" and $150,000 in "compensatory damages."

On September 27, 2011, Jackson filed a memorandum arguing that she had presented evidence sufficient to support an award of punitive damages. Edgewood filed an opposition three days later.

On October 3, 2011, the court entered the Judgment in favor of Jackson for $650,000.

On October 6, 2011, Edgewood filed a motion for JNOV and a 10–day "Motion to Amend Judgment to Conform" with the MCC, which Jackson opposed.

On October 28, 2011, Jackson filed a petition for attorneys' fees.

On February 23, 2012, the court heard argument on the motion for JNOV and the fee petition. It denied the JNOV motion and held the fee petition *sub curia.*

On March 8, 2012, the court heard argument on the motion to amend the Judgment. It held the matter *sub curia.*

On March 21, 2012, Edgewood noted an appeal from the Judgment entered on October 3, 2011, and the order denying its motion for JNOV.

On April 23, 2012, the court issued a memorandum opinion and order granting Edgewood's motion to amend the Judgment. The court directed that the jury's verdict "be reduced ... to $89,195.00, an amount equaling a two year cap on back pay less [Jackson]'s unemployment compensation." The Amended Judgment was entered that same day.[7]

On April 30, 2012, Jackson noted a cross-appeal.

On December 21, 2012, the court issued an order awarding Jackson $219,569.10 in attorneys' fees and $76,640.60 in costs. Jackson also noted an appeal from that order, but, as mentioned, that appeal is not before us at this time.

---

7. As mentioned, Edgewood filed its notice of appeal subsequent to the denial of its JNOV motion, but prior to the court's ruling on its ten-day motion to amend and the entry of the Amended Judgment. As the Court of Appeals has explained, "a notice of appeal filed prior to the withdrawal or disposition of a timely filed [ten-day] motion ... is effective. Processing of that appeal is delayed until the withdrawal or disposition of the motion." *Edsall v. Anne Arundel County,* 332 Md. 502, 508, 632 A.2d 763 (1993); Md. Rule 8–202(c). Thus, since Edgewood filed a timely 10–day motion to amend the Judgment, its notice of appeal filed prior to the court's disposition of that motion became effective on April 23, 2012, the date the court granted the motion to amend and entered the Amended Judgment.

We shall include additional facts in our discussion of the issues.

## DISCUSSION

## APPEAL

### I.

### Legal Sufficiency of the Evidence

For a number of related reasons, Edgewood contends the evidence at trial was legally insufficient to prove Jackson's claim for discrimination based on retaliation. Before turning to Edgewood's specific arguments, we shall set forth the law governing Jackson's retaliation claim.

Jackson filed suit pursuant to SG section 20–1202, which provides, in relevant part, that a

> person that is subjected to a discriminatory act prohibited by the county code [in Howard, Montgomery, or Prince George's County] may bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief.

In her complaint, Jackson alleged that Edgewood had committed a discriminatory act in violation of MCC section 27–19(c). As relevant here, that section prohibits an employer from "retaliat[ing] against any person for ... lawfully opposing any discriminatory practice prohibited under this division." Discrimination on the basis of sex is a prohibited practice. MCC § 27–19(a).

To establish a *prima facie* case of discrimination based on retaliation, a plaintiff must produce evidence that she engaged in a protected activity; her employer took an adverse action against her; and her employer's adverse action was causally connected to her protected activity. *Taylor v. Giant of Maryland, LLC,* 423 Md. 628, 658, 33 A.3d 445 (2011) (citing *Manikhi v. Mass Transit Admin.,* 360 Md. 333, 349, 758 A.2d 95 (2000)); *Killian v. Kinzer,* 123 Md.App. 60, 68, 716 A.2d 1071 (1998). If a plaintiff meets this threshold burden of

production, the burden of production then shifts to the defendant to offer a non-retaliatory reason for the adverse employment action. *See Killian,* 123 Md.App. at 68, 716 A.2d 1071; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[8] If the employer does so, the burden of production shifts back to the plaintiff to show that the proffered reasons for the employment action were a mere pretext. *Killian,* 123 Md.App. at 68, 716 A.2d 1071. As this Court explained in the context of a claim for employment discrimination on the basis of disability:

> "Pretext might be established by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' "

*Nerenberg v. RICA of S. Md.,* 131 Md.App. 646, 675, 750 A.2d 655 (2000) (quoting *Fuentes v. Perskie,* 32 F.3d 759, 765 (3rd Cir.1994)).

In the instant case, Edgewood argues that Jackson failed to make out a *prima facie* case of retaliation because the evidence was legally insufficient to prove that she engaged in a protected activity; that she was the subject of an adverse employment action; and, even if there were sufficient proof of those elements, that there was a causal connection between her protected activity and the employment action. Edgewood further maintains that, even assuming for the sake of argument that Jackson made a threshold showing of retaliation, it produced evidence of several non-discriminatory reasons for its employment actions against Jackson and Jackson failed to prove that any of these reasons were pretextual. Thus, the trial court erred in denying its motions for judgment and for JNOV.

---

**8.** Federal cases interpreting Section 2000e–3(a) of Title VII of the Civil Rights Act of 1964 are persuasive authority in interpreting Maryland's employment discrimination laws. *See, e.g., Chappell v. S. Md. Hosp., Inc.,* 320 Md. 483, 494, 578 A.2d 766 (1990).

Jackson responds that she presented relevant and competent evidence legally sufficient to prove that she engaged in protected "oppositional" activity by making a report of sex discrimination on behalf of a subordinate employee; that Edgewood reduced her salary and transferred her to a less desirable placement; that this transfer and pay cut were intended to and did in fact cause her to resign, amounting to a constructive discharge; and that her constructive discharge was causally connected to her protected oppositional activity. She maintains that Edgewood's proffered explanations for its adverse employment actions were amply rebutted by evidence she produced and were shown to be pretextual.

 "In a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion." Md. Rule 2–532(a). "We review the denial of a motion for judgment and a motion for judgment notwithstanding the verdict ("JNOV") under the same appellate lens." *Giant Food, Inc. v. Booker,* 152 Md.App. 166, 176, 831 A.2d 481 (2003). We must affirm the denial if "the record discloses any legally relevant and competent evidence, however slight, from which the jury rationally could have found as it did." *Jacobs v. Flynn,* 131 Md.App. 342, 353, 749 A.2d 174 (2000); *see also Univ. of Md. Medical Sys. Corp. v. Gholston,* 203 Md.App. 321, 329, 37 A.3d 1074, *cert. denied* 427 Md. 65, 46 A.3d 406 (2012) ("In a civil case, the evidence is legally sufficient to support a finding in support of the prevailing party if, on the facts adduced at trial viewed most favorably to that party, any reasonable fact finder could find the existence of the elements of the cause of action by a preponderance of the evidence.")

### A. Jackson's Prima Facie Case

#### 1. Protected Oppositional Activity

 An employee's complaint about an employer's allegedly discriminatory conduct, whether through formal or informal grievance procedures, constitutes protected oppositional

activity. *Crawford v. Metro. Gov't of Nashville,* 555 U.S. 271, 276, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009) (employee's report of incidents of sexual harassment during an internal review is protected activity under Title VII). A plaintiff must show that he or she held a good faith, subjective, and objectively reasonable belief that the employer engaged in discriminatory conduct. *Peters v. Jenney,* 327 F.3d 307, 320–21 (4th Cir.2003).

The evidence at trial, viewed in a light most favorable to Jackson, showed that on December 10, 2010, she witnessed Reyes discuss in close succession planned changes in employment with two employees—Wilcoxen, a male, and Wagner, a female. Reyes met privately with Wilcoxen in Jackson's office, and told him about his impending lay-off. Moments later, in a central area of the Glenview office that was not private and in which employees, tenants, and prospective tenants were present, Reyes loudly criticized Wagner for declining a transfer to another office for personal reasons and announced that her salary was going to be reduced, specifying the amount of the reduction. Immediately thereafter, Wagner told Jackson she thought that Reyes had treated her differently from Wilcoxen because of her gender. This evidence, if credited by the jurors, was legally sufficient to show that, based on what she witnessed and Wagner's stated reaction to her treatment by Reyes, Jackson held a subjective and objectively reasonable belief that Reyes had discriminated against Wagner based on her gender.

Jackson testified that, on December 15, 2009, consistent with Edgewood's internal policies, she called Azouqha, Reyes's immediate supervisor, and reported to him that Wagner had made a complaint of sex discrimination. Although Azouqha denied this in his testimony, the jurors were free to reject Azouqha's testimony and credit Jackson's testimony instead. On this evidence, reasonable jurors could find by a preponderance of the evidence that Jackson engaged in protected oppositional activity by opposing an act of discrimination on the basis of sex.

## 2. *Adverse Action*

Edgewood argues that none of the employment actions it took with respect to Jackson rose to the level of an actionable adverse action. Jackson responds that she needed only to show that she was subjected to an employment action that a "reasonable employee would have found ... materially adverse," *i.e.,* an action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R. Co. v. White,* 548 U.S. 53, 60, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal citations omitted). We agree with Jackson that she satisfied her burden.

At the time Jackson reported Wagner's grievance, she had been employed by Edgewood for thirty years, all at Glenview, and had been working as the community manager for Glenview for 20 years. She never had been disciplined. She lived in Glen Burnie, very near Glenview.

In January and February of 2010, Jackson was disciplined for poor and careless performance, was told that the disciplinary action constituted a "final warning," was directed that she must immediately improve her performance or risk termination, and then was informed that she would be transferred to a position managing two properties, one located in Virginia, more than 30 miles from where she lived, and another also located in Virginia, more than 35 miles away from Jackson's residence, in the opposite direction; and would have her salary reduced by $5,000. The evidence most favorable to Jackson showed that Jones and Reyes were trying to engineer the termination of Jackson's employment and they expected that she would resign upon being told that she was being transferred to the two distant properties that would result in at least a 70-mile-per-day drive to and from work and her pay being cut. In fact, what Jones and Reyes wanted to happen, and expected to happen, did happen. Jackson tendered her notice of resignation the day after she was told she was being transferred and her pay was being cut. This evidence plainly was sufficient to prove that Jackson suffered an adverse employment action. *See, e.g., Moniodis v. Cook,* 64 Md.App.

1, 11, 494 A.2d 212 (1985) (evidence that an employer altered an employee's working conditions with the expectation and intention that it would cause the employee to resign sufficient to prove constructive discharge).

### 3. Causal Connection

Edgewood argues that even if the first two elements of Jackson's claim were satisfied, the evidence nevertheless was legally insufficient to show a causal connection between Jackson's protected oppositional activity and her constructive discharge. This is so, Edgewood maintains, because it was undisputed that the "actual decisionmaker"—Jones—had no knowledge that Jackson had reported Wagner's complaint of discrimination against Reyes until after Jackson submitted her resignation. Edgewood further argues that Jackson's neglect of the income limitations in approving rental applications for Glenview and her failure to achieve tax-credit certification were the but-for causes of the decision to transfer her and to reduce her salary, and therefore the evidence at trial was not sufficient to show that Jackson would not have suffered these adverse employment actions even if she had not made a report that Wagner had been discriminated against.

Relying on *Taylor, supra,* Jackson responds that an employee can prove causation by adducing evidence that his or her "protected activity was a 'motivating factor' in an employer's decision to subject [him or her] to an adverse employment action, not necessarily the controlling factor." 423 Md. at 658, 33 A.3d 445. She maintains that Jones's role as the ultimate decision-maker is not dispositive because she presented evidence that Reyes had initiated the disciplinary action against her, based on his own investigation, and that Jones had relied upon Reyes's investigation in determining to transfer her, an action that Jones himself had predicted would result in her resignation.

Recently, in *Staub v. Proctor Hospital,* —— U.S. ——, 131 S.Ct. 1186, 1189, 179 L.Ed.2d 144 (2011), the Supreme Court considered "the circumstances under which an employer

may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." The Court held that "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action and if that act is a proximate cause of the ultimate employment action," then the employer may be held liable. *Id.* at 1194 (emphasis in original; footnote omitted). Moreover, if a supervisor submits a biased report urging an adverse employment action, even if the decision-maker conducts an independent investigation in response to the report and concludes that termination is justified, an employee still may show that the biased report was the proximate cause of the adverse employment action if it was one of many factors considered by the decision-maker. *Id.* at 1193.

In the instant case, Jackson presented ample evidence that Reyes had knowledge of her report that he had discriminated against Wagner in December of 2009. Jackson testified that she had reported Wagner's sex discrimination complaint to Reyes's immediate supervisor, Azouqha, on December 15, 2009. She further testified that she expected that Azouqha would discuss the complaint with Reyes. Caruso acknowledged testifying in his deposition that he believed that Azouqha and Reyes knew of Wagner's complaint, via Jackson, in December of 2009. The jurors were, of course, free to reject Reyes's and Azouqha's testimony to the contrary.

The evidence viewed most favorably to Jackson showed that, just one month after Jackson reported that Reyes had discriminated against Wagner based on gender, Reyes initiated an investigation into Jackson and authored the Disciplinary Action Memorandum citing Jackson for violations of Edgewood policies and general neglect of her duties. *See Bleich v. Florence Crittenton Servs. of Baltimore, Inc.*, 98 Md.App. 123, 142, 632 A.2d 463 (1993) (in wrongful discharge action, temporal proximity between protected activity and discharge was evidence supporting an inference that the protected activity was the proximate cause of her termination.) At that time, he

suggested to Caruso and Azouqha that termination was the appropriate sanction against Jackson.

Jones testified that he relied upon Reyes's investigation and his Disciplinary Action Memorandum in approving the subsequent decision to transfer Jackson to a position managing two properties more than 30 miles away in opposite directions, and that he did so with the knowledge that such a transfer likely would result in her resignation. On that evidence, reasonable jurors could find that Reyes instigated the disciplinary action against Jackson and that this act was the proximate cause of Jones's decision to transfer Jackson, which resulted in her resignation.

### B. "Mere Pretext" Evidence

■ Having concluded that Jackson's evidence was legally sufficient to prove a *prima facie* case of retaliation, we now turn to Edgewood's contention that the evidence was legally insufficient to prove that the "legitimate and non-retaliatory" reasons for Jackson's discharge were a pretext. Edgewood asserts that each justification for the Disciplinary Action—accepting more market tenants than permitted under the Section 236 program, tardiness in having maintenance work orders completed, and lying to the attorney representing Edgewood in the Barnes discrimination complaint case—was borne out by the evidence and was sufficient to justify Jackson's termination and, unquestionably, a lateral transfer to a less desirable location. Edgewood asserts, moreover, that it showed an independent, non-discriminatory reason that justified Jackson's transfer to a position at another property. Specifically, Edgewood points to its evidence that, upon discovering that the number of market tenants accepted at Glenview exceeded what was permitted and would result in a $1 million decrease in the number of LIHTC tax credits available to Triton, Charlton personally insisted that Glenview be managed by a tax credit certified manager. Jackson was not tax credit certified.

Jackson responds that she rebutted Edgewood's proffered justifications by showing that her acceptance of the three market tenants in 2009 was done with Davis's approval (and that Reyes was aware of this fact); that maintenance requests were handled in a prompt fashion and, in any event, that another Edgewood employee, West, bore the ultimate responsibility for fulfilling such requests and was not disciplined; and that her statements to the Edgewood attorney were accurate. With respect to her lack of tax-credit certification, Jackson points out that, of the two properties to which she was to be transferred, one (Charles Landing) also was an LIHTC property and the other (Glenreed) was in the process of applying to become an LIHTC property. Thus, her transfer to these properties was inconsistent with the stated justification. She asserts that this was evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Edgewood's proffered explanations and, as such, was sufficient to permit reasonable jurors to find by a preponderance of the evidence that the explanations were pretextual. *Nerenberg, supra,* 131 Md.App. at 675, 750 A.2d 655 (quoting *Fuentes, supra,* 32 F.3d at 765). We agree.

 It is a fundamental principle that the weighing of competing inferences to be drawn from evidence of conflicting facts is within the province of the jury:

"When the interplay of circumstances is susceptible of different interpretations by rational minds, the problem is essentially one for the jury; the trial judge is not permitted to transform it into a question of law for his own determination. The choice between conflicting facts and the weighing and assessing of competing inferences radiating therefrom is the jury's province."

*Grady v. Brown,* 408 Md. 182, 198, 968 A.2d 1084 (2009) (quoting *Rea Construction Co. v. Robey,* 204 Md. 94, 100, 102 A.2d 745 (1954)).

Here, the evidence of Charlton's concern about Jackson's remaining at Glenview was shaky, at best. Although Jones testified that he had received complaints from Charlton about Jackson's performance, he acknowledged that he had no e-

mails or other documentation to support any such complaint. An e-mail in which Charlton expressed to Jones an interest in getting an LIHTC-certified manager in place at Glenview was sent by Charlton *in response* to Reyes's e-mail stating that Edgewood was planning to terminate Jackson and, in the interim, intended to transfer Jackson to another Triton property. The jurors reasonably could have found by a preponderance of the evidence that Charlton did not complain about Jackson and only requested an LIHTC-certified manager at Glenview after being told that Jackson no longer would be there; and therefore Jones's testimony that Jackson was disciplined because of complaints by Charlton was pretextual.

Similarly, the jurors were free to accept Jackson's rebuttal of the disciplinary charges against her. She presented evidence showing that her handling of Barnes's maintenance requests was appropriate and that Barnes was a difficult tenant with a long history of unsubstantiated complaints. She also presented evidence that, if credited, supported her view that a "leak" never was found in Barnes's apartment and therefore her statement to Edgewood's attorney in the Barnes matter was accurate. Finally, Jackson and West each testified that delays in the handling of maintenance requests never had resulted in a disciplinary action in the past and, in any event, West bore the ultimate responsibility for delays experienced at Glenview, if there were any.

This evidence was legally sufficient for the jurors to find by a preponderance of the evidence that Edgewood's "proffered legitimate reasons for its action" were "unworthy of credence" and, accordingly, that Edgewood did not "act for the asserted non-discriminatory reasons." *Nerenberg,* 131 Md.App. at 675, 750 A.2d 655 (quoting *Fuentes, supra,* 32 F.3d at 765). For all these reasons, we perceive no error in the trial court's decision to deny Edgewood's motions for judgment and for JNOV.

## II.

### Special Verdict Sheet

Edgewood contends the trial court abused its discretion by declining to use a verdict sheet that Edgewood pro-

posed; and that this was reversible error. Edgewood asserts that its "step-by-step verdict sheet encouraged orderly analysis by the jurors" and "minimized the risk that the jurors would confuse the threshold issues."

Jackson responds that the court did not abuse its discretion by using her proposed verdict sheet and, in any event, Edgewood has failed to demonstrate that it was prejudiced as a consequence of the court's using her verdict sheet.

At the close of all the evidence, the court heard argument about the parties' proposed verdict sheets. Jackson's counsel proposed a "one-page verdict form that [he thought] comport[ed] with this Court's general practice." Edgewood's counsel proposed a "three-page verdict form with 10 separate questions."

The court reviewed Jackson's proposed verdict sheet, directing her counsel to remove two questions pertaining to punitive damages. The court further remarked: "Really, that's all you really need." Edgewood's counsel argued, however, that the jury should be given a verdict sheet that included the "three essential elements" of retaliatory discharge—protected activity, adverse action, and causation—and that "ask[ed] the jury to make [a] finding as to each element." The court opined that the verdict sheet "just needs to be simple questions," but agreed that it would be appropriate to ask the jury to first find that Jackson had engaged in a protected activity before considering damages. Edgewood's counsel responded by asking whether she should "try to modify [the verdict sheet]." The judge responded that they could make "adjustments in the verdict sheet" at a later point in time because the jury did not need a verdict sheet at the beginning of deliberations. The court then turned to the issue of jury instructions.

The verdict sheet issue was not raised again before the jury was sent to deliberate. Apparently, without the knowledge of the judge or counsel, Jackson's proposed verdict sheet (minus the punitive damages questions) was provided to the jurors at the outset of deliberations. That verdict sheet stated as follows:

1. On Donna Jackson's claim of retaliation in violation of the [MCC] against Edgewood [ ], we find in favor of? ____ Plaintiff, Donna Jackson ____ Defendant, Edgewood

If you find for Plaintiff, continue to Question 2. If you find for Defendant, you may stop deliberating.

2. If you found for Plaintiff Donna Jackson, what is the amount of economic and/or compensatory damages to be awarded?

Economic Damages: $ _____;

Compensatory Damages: $ _____;

In the meantime, Edgewood had modified its proposed verdict sheet, in response to the court's suggestions, substituting two questions in place of the first question, both of which were susceptible of a "yes" or "no" answer: 1) "Has plaintiff proved that she engaged in a protected activity?" and 2) "Has Plaintiff proven she was retaliated against in violation of the [MCC]?" This proposed verdict sheet directed the jurors to stop deliberating if they answered "No" to either question.

About one hour after the jurors began deliberating, the court entertained further discussion on the verdict sheet issue. The court observed that both proposed verdict sheets were correct, but that Edgewood's was "more detailed and clearer." By then, the court and counsel knew that the jurors had Jackson's verdict sheet with them in the jury room. The court determined that, given that Jackson's verdict sheet already had been provided to the jurors, it would be improper and confusing to substitute Edgewood's proposed verdict sheet at that time. Edgewood's counsel noted her objection to this ruling.

The Court of Appeals has explained that

the decision to use a particular verdict sheet "will not be reversed absent abuse of discretion." *Applied Indus. Techs. v. Ludemann,* 148 Md.App. 272, 287, 811 A.2d 845, 854 (2002). Moreover, Maryland appellate courts generally will not reverse even an unreasonable decision without evidence of prejudice/harm. *See Owens—Corning Fiberg-*

*las Corp. v. Garrett,* 343 Md. 500, 526, 682 A.2d 1143, 1155 (1996).

*Consol. Waste Indus., Inc. v. Standard Equip. Co.,* 421 Md. 210, 220, 26 A.3d 352 (2011) (footnote omitted).

We perceive no abuse of discretion in the instant case. Both proposed verdict sheets accurately stated the findings required to be made by the jurors to decide the case. Moreover, Edgewood has not shown any prejudice to it flowing from the trial court's decision to use Jackson's proposed verdict sheet. The jurors properly were instructed on the elements of an action for retaliatory discharge in violation of the MCC, including that they would need to find by a preponderance of the evidence that Jackson engaged in a protected activity. The verdict sheet as used was not legally incorrect or confusing, and there is no reason to think that the jurors would have decided this case differently had Edgewood's proposed verdict sheet been used.

## CROSS–APPEAL

### I.

#### Grant of Edgewood's Motion to Amend

Jackson contends the trial court committed an error of law in granting Edgewood's motion to amend the Judgment by reducing the damages awarded to "comport" with a limitation on damages that is set forth in MCC section 27–8. We begin by reviewing the pertinent statutory framework.

Maryland's anti-discrimination laws are codified at Title 20 of the State Government Article.[9] Several subtitles are relevant to our analysis. First, in 1965, the General Assembly enacted the Fair Employment Practices Act ("FEPA"), now codified at Subtitle 6. 1965 Laws of Maryland, Ch. 717. The

---

9. Prior to 2009, these laws were codified at Article 49B of the Maryland Code. By Chapter 120 of the 2009 Laws of Maryland, the General Assembly repealed Article 49B and recodified it with certain amendments in the newly created Title 20 of the State Government Article.

FEPA prohibits, *inter alia*, discrimination on the basis of sex, including retaliating against an employee for opposing a discriminatory practice. SG § 20–606(a) & (f).

Before 2007, the only remedy available to an employee claiming discrimination in violation of the FEPA was to file a charge with the MCHR. *See Md. Comm'n on Human Relations v. Downey Communc'ns, Inc.* 110 Md.App. 493, 542, 678 A.2d 55 (1996). In *Shabazz v. Bob Evans Farms, Inc.,* 163 Md.App. 602, 624, 881 A.2d 1212 (2005), we discussed that "administrative enforcement remedy," then codified at Article 49B:

> [T]he Commission has the power to receive complaints about alleged acts of discrimination (including unlawful employment practices), investigate, determine probable cause to support an allegation, make a complaint if there is probable cause and the alleged acts are not eliminated by agreement, and refer the matter for determination by a hearing officer, in a contested case hearing under the Administrative Procedure Act.

(Citing *State Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.,* 149 Md.App. 666, 684–85, 818 A.2d 259 (2003).) Upon a finding by a hearing officer that an employer violated the FEPA, the hearing officer was authorized to order the employee reinstated, with or without backpay, and to award other equitable relief. *Id.* (citing Article 49B, § 11(e)).

In 2007, however, the General Assembly amended the FEPA to authorize an employee and the MCHR to bring a civil action against an employer and to require that administrative charges be brought before an Administrative Law Judge instead of a hearing officer. Laws of 2007, chs. 176 & 177, § 2. This legislation also expanded the remedies available in an administrative proceeding to allow compensatory damages in addition to backpay. *Id.; see* SG § 20–1009. The amount of the total additional compensatory damages awarded to an employee was capped based upon the size of the

employer.[10] *Id.; see* SG § 20–1009(b)(3). Finally, the legislation provided that the remedies available in a private civil action or in an action brought by the MCHR were identical to those available in an administrative action with one exception: an employee could be awarded punitive damages only in a private civil action. The punitive damages combined with any compensatory damages also were subject to the damages caps based upon the size of the employer. *Id.;* SG § 20–1012(b) (civil action by MCHR); SG § 20–1013(d) (civil action by employee). The FEPA was again amended in 2009 to, *inter alia,* limit an award of backpay to the two years preceding the filing of a complaint. Laws of 2009, Ch. 56; SG § 20–1009(b)(5).

Subtitle 12, entitled "Civil Actions–Violations of County Discrimination Laws," provides an alternative avenue of relief for residents of Baltimore, Howard, Montgomery, and Prince George's counties. SG section 20–1202(b), authorizes "a person that is subjected to a discriminatory act prohibited by the county code [in Howard, Montgomery, or Prince George's County to] bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief." A plaintiff must commence such an action "within 2 years after the occurrence of the alleged discriminatory act," but no sooner than "45 days after the aggrieved person files a complaint with the county unit responsible for handling violations of the county discrimination laws." SG § 20–1202(c). A prevailing plaintiff may recover "reasonable attorneys' fees, expert witness fees, and costs." SG § 20–1202(d).

SG section 20–1203(b) authorizes a person employed in Baltimore County by an employer "with fewer than 15 employees and that is subjected to a discriminatory act prohibited by the county code [to] bring and maintain a civil action

---

**10.** $50,000 for employers with more than 15, but less than 100 employees; $100,000 for employers with more than 100, but less than 200 employees; $200,000 for employers with more than 200, but less than 500 employees; and $300,000 for employers with more than 500 employees. SG § 20–1009(b)(3).

against the employer that committed the alleged discriminatory act for relief as provided under subsection (d) of this section."[11] At subsection (d), the statute provides that, if the employee prevails in the action, he or she may be awarded injunctive relief, "compensatory damages, including backpay," and reasonable attorneys' fees. Punitive damages may not be awarded, however. SG § 20–1203(d)(2).

In the instant case, Jackson filed suit under SG section 20–1202, alleging an underlying violation of section 27–19 of the MCC, which prohibits discrimination in employment, including retaliation against an employee opposing a discriminatory act. Chapter 27 of the MCC governs "Human Rights and Civil Liberties." Article I creates a 15–member "Commission on Human Rights" ("the Commission"), appointed by the Montgomery County Executive, to research, educate and promote equal opportunity in the county. In addition to prohibiting discrimination in employment, Article I governs discrimination in places of public accommodation, in real estate, and racial or religious intimidation.

Article I of Chapter 27 creates two alternative avenues of relief for any person discriminated against in violation of the Chapter (including a person subjected to employment discrimination). One avenue allows the employee to file a complaint with the Director of the Office of Human Rights, seeking administrative relief before a case review board consisting of a three-member panel drawn from the members of the Commission. As relevant here, MCC section 27–8 governs the "Penalties and relief" a case review board may award following a finding of a violation of the anti-discrimination provisions of Chapter 27. Subsection (a) states that

---

11. The Baltimore County Code ("BCC") prohibits discrimination in employment on the basis of "race, creed, religion, color, sex, age, national origin, marital status, sexual orientation, gender identity or expression, or physical or mental disability." BCC § 29–1–101(d). It does not expressly authorize an employee to bring a private cause of action for a violation of the Code. In an administrative proceeding under the Code, the employee may be reinstated and be awarded "other equitable relief," which would include backpay, but may not otherwise be awarded damages. BCC § 29–3–109(k)(2).

the case review board may order the payment of damages (*other than punitive damages*) and any other relief that the law and the facts warrant, such as:

(1) compensation for

(A) reasonable attorney's fees;

(B) property damage;

(C) personal injury;

(D) unreimbursed travel or other reasonable expenses;

(E) *damages not exceeding $500,000 for humiliation and embarrassment,* based on the nature of the humiliation and embarrassment, including its severity, duration, frequency, and breadth of observation by others;

(F) financial losses resulting from the discriminatory act . . . ;

(G) interest on any damages from the date of the discriminatory act or violation, as provided in subsection (c);

(2) equitable relief to prevent the discrimination. . . .

(3) *consequential damages, such as lost wages from employment discrimination . . . for up to 2 years after the violation, not exceeding the actual difference in expenses or benefits that the complainant realized while seeking to mitigate the consequences of the violation (such as income from alternative employment or unemployment compensation following employment discrimination); and*

(4) any other relief that furthers the purposes of this Article or Article X or is necessary to eliminate the effects of any discrimination prohibited under this Article.

(Emphasis added.) Subsection (b) authorizes the case review board to impose civil penalties upon the person found to have violated the Chapter, including, in the case of a finding of employment discrimination, $5,000 for each violation. Subsection (c) authorizes the case review board to award the complainant interest on any damages awarded.

In the instant case, however, Jackson did not pursue the administrative remedy avenue under Chapter 27. Instead,

she pursued the alternate avenue of relief afforded by Article I of that Chapter, by filing suit against Edgewood in the circuit court, as authorized by MCC section 27–9(a). MCC section 27–9(a) provides in relevant part, "[a]ny person subjected to an act of discrimination or intimidation under this article may pursue a civil action under Maryland law. A person who substantially prevails in a civil action may recover costs and reasonable attorney's fees."

In its motion to amend the Judgment, Edgewood argued that because Jackson's retaliation action was for a violation of MCC section 27–19(c), her "remedies [were] limited to those enumerated in MCC § 27–8." On this basis, Edgewood asked the court to reduce the $500,000 verdict for economic damages in Jackson's favor "to the 2 year limitation on lost wages and [to] offset [the award] by [Jackson]'s receipt of unemployment benefits." It calculated Jackson's lost wages for the two-year period following her constructive discharge at $119,125, based upon the evidence she had submitted at trial ($54,275 in 2010 and $64,849 in 2011). It further calculated the value of the unemployment benefits she had received since her constructive discharge at $29,930.[12] It thus asked the court to reduce the $500,000 in economic damages to $89,195 ($119,125 minus $29,930). Edgewood did not seek a reduction in the award of $150,000 in compensatory damages.[13] Accordingly, it took the

---

**12.** Edgewood calculated the amount of unemployment benefits Jackson had been paid by using a notice it had received from the Department of Labor, Licensing, and Regulation indicating that Jackson would be paid $410 per week for 26 weeks; and based on Jackson's deposition testimony that she had received benefits for "46 or 47 weeks ... past [her] ... initial 26 weeks." It thus multiplied her weekly benefit amount by 73 weeks. Edgewood acknowledged that neither the notice nor the excerpt from Jackson's deposition were introduced into evidence at trial. It argued, however, that the trial court had the authority under Rule 2–534 to "open the judgment to receive additional evidence."

**13.** As noted above, the award of "compensatory damages" plainly was non-economic relief. Thus, even if Jackson's remedies were limited to those set forth in MCC section 27–8, the $150,000 in non-economic damages was permissible as "damages not exceeding $500,000 for humiliation and embarrassment."

position that the Judgment should be amended to award a total of $239,195 in damages.

Jackson responded that because she brought her action pursuant to SG section 20–1202, which does not impose a limit upon the type or amount of relief available, the common law of damages governed her claim. She further argued that her damages should not be offset by her receipt of unemployment benefits because MCC section 27–8's offset provision does not apply to her claim; unemployment benefits are a collateral source under Maryland law; and, in any event, there was no evidence admitted at trial that showed the amount of unemployment benefits she actually received.

The court heard argument of counsel on the motion to amend and, on April 23, 2012, issued and entered a memorandum opinion and order granting the motion. The court reasoned that SG section 20–1202 "authorizes lawsuits in Circuit Court based on local ordinances," and that, "[b]y extension, damages are properly gauged by the local ordinance." The court opined that Maryland's common law of damages only is "the default damage provision when there are no statutory damages," but concluded that MCC section 27–8 set forth "statutory damages to properly gauge the award of damages" in this case. The court thus decided the jury verdict for economic damages in favor of Jackson had to be reduced to two years' of back pay, less the amount of unemployment benefits she had received. It entered the Amended Judgment in the amount of $89,195 on that basis.

 First, as discussed, Edgewood only sought a reduction of the jurors' verdict in favor of Jackson for economic damages. Without explanation, the court not only reduced the economic damages award but also eliminated the jury's entire award of $150,000 in non-economic damages. Given that the elimination of the $150,000 non-economic damages award was not requested by Edgewood in its motion and was done without any apparent or expressed legal basis, it is beyond cavil that the court committed error.

We now turn to the propriety of the court's decision to reduce the economic damage award of $500,000 to "comport" with MCC section 27–8. Jackson asserts this ruling was legally incorrect for three reasons. First, the plain language of MCC section 27–8 "is directed solely to administrative claims brought before [a case review board]." Second, MCC section 27–9, authorizing a private cause of action for violation of the anti-discrimination provisions of the MCC, "imposes no limitation on damages." Finally, SG section 20–1202, which authorizes a private cause of action for discrimination in violation of the MCC, does not impose any limit on the type or amount of damages recoverable. Jackson asserts, alternatively, that even if MCC section 27–8 applies to private causes of action, it is clear from the provision permitting a case review board to award "any other relief that furthers the purposes of this Article" that the limitation on economic damages is not absolute.

Edgewood responds that, although Jackson's action for retaliation was authorized by SG section 20–1202, an enabling statute, the action was premised on an alleged violation of MCC section 27–19. As such, Jackson's remedies are limited to those available under the administrative procedures of the MCC, as set forth in section 27–8. Its argument is as follows. The private cause of action authorized by MCC section 27–9 was "created by the Montgomery County Council and approved and authorized by the Maryland General Assembly"; therefore, it is a local law authorized by the Home Rule Amendment and is not preempted by state law. Because Jackson's cause of action arises under the MCC, we must construe the term "damages" in MCC section 27–9 within the context of the MCC as a whole, which includes MCC section 27–8. To construe section 27–9 otherwise would create the absurd result that a complainant who sues in the circuit court may be awarded much greater damages than a claimant who pursues administrative relief for the same violation.

Because we are tasked with interpreting state and local laws, we are guided by the sound principles of statutory construction:

"In statutory interpretation, our primary goal is always 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules.' *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Gen. Motors Corp. v. Seay,* 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). *See also Dep't of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007). We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' *Barbre,* 402 Md. at 172, 935 A.2d at 708; *Kelly,* 397 Md. at 420, 918 A.2d at 482. *See also Kane v. Bd. of Appeals of Prince George's County,* 390 Md. 145, 167, 887 A.2d 1060, 1073 (2005). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. *Barbre,* 402 Md. at 173, 935 A.2d at 708–09; *Kelly,* 397 Md. at 419, 918 A.2d at 482; *City of Frederick v. Pickett,* 392 Md. 411, 427, 897 A.2d 228, 237 (2006); *Davis v. Slater,* 383 Md. 599, 604–05, 861 A.2d 78, 81 (2004)."

*Miller v. Mathias,* 428 Md. 419, 450–51, 52 A.3d 53 (2012) (quoting *Ray v. State,* 410 Md. 384, 404–405, 978 A.2d 736 (2009)).

By their plain language, MCC sections 27–8 and 27–9 provide alternative avenues for relief for violations of the anti-discrimination provisions of the county code. MCC section 27–8 governs the "[p]enalties and relief" that may be awarded by a "case review board" after an administrative finding of a discriminatory act under the MCC. In contrast, MCC section 27–9 authorizes "[a]ny person subjected to an act of discrimination or intimidation under this article" to bring a "civil action under *Maryland law.*" (Emphasis added.) It does not limit the damages that may be awarded in such an action to those stated in the immediately preceding section 27–8 or by reference to any other provision of federal, state, or local law. Moreover, the two sections both allow a prevailing party to

recover reasonable attorneys' fees. If MCC section 27–9 were read to incorporate the damages provisions of MCC section 27–8, the attorneys' fees clause would be superfluous.

Additionally, in *McCrory Corp. v. Fowler*, 319 Md. 12, 19, 570 A.2d 834 (1990), the Court of Appeals construed the predecessor ordinance to MCC section 27–9 to permit a plaintiff to seek "unlimited money damages." In *McCrory*, the Court of Appeals considered two questions certified to it by the United States District Court for the District of Maryland. The first was whether then section 27–20(a) of the MCC,[14] which "creat[ed] a private cause of action for employment discrimination entitling a claimant to sue for ***damages, injunctive or other civil relief***" exceeded the authority delegated to Montgomery County, a home rule county, under the Express Powers Act. *Id.* at 13, 570 A.2d 834 (emphasis added.) The second question was whether MCC section 27–20(a) was a valid grant of authority or was preempted by state discrimination laws, then codified at Article 49B of the Maryland Code. The Court held that MCC section 27–20(a) was not preempted by Article 49B, but that it was a local law that was not authorized by the Express Powers Act.

The plaintiff in *McCrory* had alleged that he was constructively discharged for refusing to follow directives not to hire any African–American workers. He filed suit in the Circuit Court for Montgomery County against his employer for retaliation under 42 U.S.C. § 1981 and for abusive discharge. After the employer removed the case to federal court, the plaintiff amended his complaint to eliminate the claim for abusive discharge and to substitute a claim under MCC section 27–20(a). He sought "over $1.8 million in compensatory and punitive damages." *Id.* at 15, 570 A.2d 834.

---

14. MCC section 27–20(a) provided:

> Any person who has been subjected to any act of discrimination prohibited under this division shall be deemed to have been denied a civil right and shall be entitled to sue for damages, injunction, or other civil relief, including reasonable attorney's fees; provided, however, that no suit shall be commenced until forty-five (45) days after a complaint alleging such an act of discrimination has been filed with the commission. . . .

After discussing the difference between a "local law" authorized under the Express Powers Act and a general law that exceeds the authority granted a home rule county to enact, the Court turned to the purpose and effect of MCC section 27–20:

> Section 27–20(a) of the Montgomery County Code authorizes a private citizen to seek redress for another private citizen's violation of a county anti-employment discrimination ordinance *by instituting a judicial action in the courts of the State for, inter alia, unlimited money damages.* Fowler, for example, is seeking over $1.8 million. While a plaintiff must first file a complaint with an administrative agency, he is free to institute a civil action after forty-five days have elapsed. In the present case, the administrative agency followed its standard policy and closed Fowler's complaint when he "decided to pursue his claim in a judicial forum." Thus, the judicial action is effectively independent of any county administrative proceeding.

*Id.* at 19–20, 570 A.2d 834 (emphasis added). The Court concluded that Montgomery County as a local jurisdiction is not authorized to "create[ ] a new judicial cause of action between private individuals," as that authority lies with the General Assembly or is within the province of the Court of Appeals "under its authority to modify the common law." *Id.* at 20, 570 A.2d 834. The Court held that, while a home rule county has "concurrent authority to provide administrative remedies not in conflict with state law," MCC section 27–20(a) exceeded the authority conferred upon Montgomery County under the Express Powers Act. *Id.*

In 1992, in response to the *McCrory* decision, the General Assembly enacted section 42(a) of Article 49B, later recodified without substantive change at SG section 20–1202, creating a "new cause of action in the circuit courts for violation of the local antidiscrimination laws of Montgomery County." *Shabazz,* 163 Md.App. at 626, 881 A.2d 1212.[15] The Court of

---

**15.** One year later, it was amended to add Prince George's County and Howard County. Laws of 1993, Ch. 152.

Appeals has described the legislative history and purpose of SG section 20–1202 as follows:

> In 1992, responding to our holding in *McCrory*, the General Assembly passed House Bill 722, which created the original version of § 42(a) [now SG section 20–1202] thereby authorizing explicitly private civil actions for violations of the anti-discrimination provisions of the Montgomery County Code. The Preamble to House Bill 722 left no doubt that the purpose of the measure was to overrule legislatively our decision in *McCrory*. In no uncertain terms, it stated:

>> WHEREAS, On March 7, 1990 the Maryland Court of Appeals invalidated Section 27–20(a) of the Montgomery County Code, which was enacted in 1973 and provides for private causes of action for violations of certain County discrimination laws; and WHEREAS, The Maryland Court of Appeals held in *McCrory Corp. v. Fowler* that the Express Powers Act did not provide adequate authority to create private causes of actions and that the creation of a new private cause of action has traditionally been the province of the General Assembly or the Court of Appeals; and

>> WHEREAS, The General Assembly believes that it is important to provide full protection of the law to its citizens and that allowing private causes of action for violations of certain county discrimination laws, under certain circumstances, is appropriate; . . . .

> 1992 Md. Laws 3446.

*Washington Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 628–29, 994 A.2d 411 (2010).

We must presume that the legislature "meant what it said and said what it meant" when it enacted SG section 20–1202 using language nearly identical to the language in MCC section 27–20(a). *E.g., Witte v. Azarian*, 369 Md. 518, 525, 801 A.2d 160 (2002). *See also Howard County Dep't of Social Servs. v. Linda J.*, 161 Md.App. 402, 409, 869 A.2d 404 (2005) (legislature must be presumed to have "understood and intended" to use the language it used). As the *McCrory* Court

had held, this language authorized recovery of "unlimited money damages." *Compare* SG section 20–1202(b) (authorizing a plaintiff to seek "damages, injunctive relief, or other civil relief") *with* MCC § 27–20(a) (1973) (authorizing a plaintiff to seek "damages, injunctive or other civil relief"). Had the legislature intended to limit the remedies available to a plaintiff suing for a violation of the anti-discrimination provisions of the MCC, it could have included limitations either within section 20–1202 or by reference to MCC section 27–8. It did neither.

Moreover, the legislature has made clear that it is fully aware of how to specify the damages available for violations of state or county anti-discrimination laws. As discussed, it specified the types of damages available to employees suing for a violation of the BCC when, in 1997, it enacted then Article 49B, section 43, now codified at SG section 20–1203. *See* 1997 Laws of Maryland, Ch. 348. Similarly, in 2007, when the legislature amended Article 49B to authorize a private cause of action for violations of the FEPA and the other anti-discrimination laws therein, it specified that a successful plaintiff is entitled to the same remedies available in an administrative action,[16] with the exception of punitive damages, which only were allowable in a private cause of action brought by an employee.

This Courts's decision in *Shabazz*, 163 Md.App. at 602, 881 A.2d 1212, also is consistent with this construction. There, the plaintiff, Wendy Shabazz, who is African–American, had worked as a server in a Bob Evans restaurant in Bowie. She alleged that certain policy changes at the restaurant that had the effect of limiting a server's ability to develop regular

---

**16.** Edgewood urges us to view these enactments as suggesting creation of an overarching scheme to permit a private plaintiff to recover no more relief than would be available in an administrative proceeding for the same underlying violation. Even if we were to find merit in this argument, which we do not, SG section 20–1203 explicitly authorizes a plaintiff suing for a violation of the BCC in the circuit court to recover compensatory damages *in addition to* backpay, whereas backpay is the only monetary relief available in an administrative action brought under the BCC.

customers and increase his or her tips were being applied in a discriminatory manner. She complained to the assistant manager, who, in turn, communicated the complaint to Shabazz's immediate supervisor, Martin. Martin promptly fired Shabazz. Two days later, after protesting her termination, Shabazz was reinstated to her position. She continued to complain of less desirable work assignments until she was again terminated by Martin, three months later.

Shabazz filed suit in the Circuit Court for Prince George's County against Bob Evans and Martin, asserting two violations of the PGCC: unlawful employment discrimination on the basis of her race; and retaliation. She sought "economic damages, compensatory damages, and punitive damages to be determined at trial, plus attorneys' fees, costs," and other appropriate relief. *Id.* at 614, 881 A.2d 1212.

The case was tried to a jury. At the close of all the evidence, Shabazz withdrew her claim for economic damages. She argued to the jury that it should award compensatory damages for pain and suffering and punitive damages. The jurors returned a verdict finding that Bob Evans was not liable for race discrimination or retaliation, but finding that Martin had "unlawfully discharged [Shabazz] in retaliation for her complaint of discriminatory conduct." *Id.* at 616, 881 A.2d 1212. The jurors awarded Shabazz "0" in compensatory damages and $85,000 in punitive damages. *Id.* at 617, 881 A.2d 1212. The court entered two judgments: one in favor of Bob Evans and against Shabazz for costs; and one against Martin and in favor of Shabazz for $85,000 and costs.

Martin moved for JNOV, arguing that because the award of punitive damages was not supported by a predicate award of compensatory damages, it had to be stricken. Shabazz filed a post-judgment motion, as well, seeking to have the court determine and award her backpay "as a form of 'make whole' equitable relief." *Id.*

In analyzing Shabazz's backpay argument, we considered the state and federal anti-discrimination law schemes. We explained that, at that time, the FEPA, then codified in Article

49B, prohibited at section 16(f) retaliation against an employee for making a complaint of unlawful discrimination. It did not authorize a private cause of action for a violation of that section, however. Rather, the FEPA provided only an administrative enforcement mechanism for violations of section 16(f). Upon a finding of a violation, the MCHR could order an employee reinstated and award backpay, but could not award damages or other monetary relief. In contrast, under then recent changes to federal anti-discrimination laws set forth at Title VII, an employee could bring a private cause of action to recover compensatory and punitive damages.

We then turned to the relief available under then Article 49B, section 42(a), permitting a "civil action" for "damages, injunctive relief, or other civil relief" against a person who committed an "act of discrimination prohibited by the [PGCC]." Section 2–185(a) of the PGCC prohibited, *inter alia,* discrimination on the basis of race. Shabazz argued that she could recover backpay under section 42(a) and that because backpay was in the nature of equitable relief, it was for the court to determine after liability had been found.

We concluded, however, that even if section 42(a) authorized Shabazz to pursue backpay as an equitable remedy, it only was recoverable against Bob Evans, not against Martin and because Bob Evans had been found not liable, her claim failed. Alternatively, we concluded that, because section 42(a) permitted Shabazz to seek lost wages as a form of damages, it could not be construed to also permit her to seek backpay as postjudgment equitable relief. We explained that Title VII expressly carved out backpay as an equitable remedy, permitting the court to award backpay and the jury to award " 'other compensatory damages.' " *Id.* at 630, 881 A.2d 1212 (quoting *Corti v. Storage Technology Corp.,* 304 F.3d 336, 344 (4th Cir.2002)). In contrast, "the cause of action [ ] created in section 42, for violation of three local anti-employment discrimination laws, does not carve out backpay and disallow recovery of lost earnings from recovery as damages." *Id.* at 631, 881 A.2d 1212. Therefore, "there was nothing to preclude Shabazz from going forward with her economic claim of lost

earnings before the jury." *Id.* Having made the decision to withdraw that claim from the jury's consideration, however, she had waived any entitlement to that relief.

We also rejected Shabazz's argument that the jurors' award of punitive damages could stand in the absence of an underlying award of compensatory damages. We explained that the federal courts of appeal were in "general agreement" that an equitable award of backpay by the court in an action under Title VII was sufficient to support an award of punitive damages by a jury without an award of compensatory damages. *Id.* at 634, 881 A.2d 1212. In contrast to the controlling provisions of Title VII, however, section 42(a) did not "make any specific reference to punitive damages" or to federal jurisprudence interpreting Title VII. *Id.* at 638, 881 A.2d 1212. We opined:

> Unless the General Assembly has stated otherwise, which it has not, the meaning of section 42, a state enactment, is to be interpreted by application of Maryland common law. That includes the Maryland common law of damages, and further, the Maryland common law of punitive damages
> . . . . .

*Id.* Because under Maryland common law an award of punitive damages must be supported by an award of compensatory damages, which at the least would be an award of nominal damages, we held that the trial court was legally correct in granting Martin's motion for JNOV.

Finally, in the case at bar, Edgewood relies upon *Makovi v. Sherwin-Williams Company*, 316 Md. 603, 561 A.2d 179 (1989), and *Chappell*, 320 Md. at 483, 578 A.2d 766, for the proposition that "statutory remedies for statutory claims 'are exclusive.' " This reliance is misplaced. In *Makovi*, the Court of Appeals held that an employee could not bring a tort action for abusive discharge in violation of the clear mandate of public policy expressed in the FEPA and Title VII. The Court explained that the FEPA predated its decision in *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), recognizing the tort of abusive discharge. It commented that

by recognizing the tort of abusive discharge in *Adler* it had intended to "vindicat[e] an otherwise civilly unremedied public policy violation." 316 Md. at 626, 561 A.2d 179. The Court concluded that because the FEPA already prohibited employment discrimination and provided administrative remedies, including injunctive relief and 2 years' of backpay, to permit an employee to sue for "full tort damages" would "upset[ ] the balance between right and remedy struck by the Legislature in establishing the very policy relied upon." *Id.*

Just one year later, in *Chappell*, the Court of Appeals reaffirmed its holding in *Makovi*, explaining that "the tort of abusive discharge will not lie where the public policy sought to be vindicated by the tort is expressed in a statute which carries its own remedy for vindicating that public policy." 320 Md. at 490, 578 A.2d 766. Thus, because the FEPA provides a remedy for an employee alleging discrimination in employment, including retaliatory discharge for opposing discriminatory practices, that it precludes a tort remedy.

We return to the case at bar. Here, Jackson did not file a tort suit for wrongful discharge alleging a violation of a clear mandate of public policy expressed in the FEPA, in the MCC, or in Title VII. Rather, she brought a statutory action pursuant to SG section 20–1202, in which she alleged a violation of MCC section 27–19 and sought "damages, injunctive relief, or other civil relief," as authorized by that statute. Thus, *Chappell* and *Makovi* are inapposite.

■■■ As this Court held in *Shabazz*, Maryland's common law of damages is the default provision absent some evidence of a legislative intention to enlarge or restrict the type and amount of remedies available. The operative statutes and ordinances in this case plainly and unambiguously authorize a private civil action for common law damages for a violation of the anti-discrimination provisions of the MCC. There is no evidence of any intention to transport the limitation on damages in an administrative proceeding under Article I, Chapter 27 of the MCC into SG section 20–1202. For all of these

reasons, the trial court erred in granting Edgewood's motion to amend the Judgment.

## II.

### Unemployment Benefits

We also agree with Jackson's contention that the trial court erred by reducing the verdict in her favor by the amount of unemployment benefits she received. Jackson maintains that this ruling was contrary to the collateral source rule. Edgewood does not dispute that unemployment benefits are a collateral source. It argues that a reduction in the verdict based on the amount of unemployment benefits received was required under MCC section 27–8(a)(3). For the reasons already discussed, we reject Edgewood's argument.

"The collateral source rule permits an injured person to recover the full amount of his or her provable damages, 'regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor.'" *Haischer v. CSX Transp., Inc.,* 381 Md. 119, 132, 848 A.2d 620 (2004) (quoting *Motor Vehicle Admin. v. Seidel,* 326 Md. 237, 253, 604 A.2d 473 (1992)). A majority of federal circuit courts considering the applicability *vel non* of the collateral source rule to unemployment benefits in actions brought under Title VII have held that an employee's damages should not be offset by unemployment benefits received. *See Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, 82–83 (3rd Cir.1983); *EEOC v. Ford Motor Co.,* 645 F.2d 183, 195–96 (4th Cir.1981), *rev'd on other grounds,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); *Rasimas v. Michigan Dep't. of Mental Health,* 714 F.2d 614, 627–28 (6th Cir.1983); *Kauffman v. Sidereal Corp.,* 695 F.2d 343, 346–47 (9th Cir.1982) *(per curiam)*; *Brown v. A.J. Gerrard Mfg. Co.,* 715 F.2d 1549, 1550 (11th Cir.1983) *(en banc) (per curiam)*. *But see Dailey v. Societe Generale,* 108 F.3d 451, 459–60 (2nd cir.1997) (determination as to whether unemployment benefits may be deducted from a Title VII award left to discretion of the district court). We find the reasoning of the majority line of cases on this

issue persuasive and conclude that the jury's verdict in favor of Jackson for "economic damages," which, as the jury was instructed and counsel argued was the loss of salary and benefits she otherwise would have received, was not subject to reduction based on her receipt of unemployment benefits.

█ Moreover, even if we were not persuaded that unemployment benefits were subject to the collateral source rule, we nonetheless would hold that the circuit court erred in reducing the verdict on this basis when, as here, Edgewood did not introduce evidence or make a proffer at trial of the amount of unemployment benefits Jackson received.

## III.

### Punitive Damages

Finally, Jackson contends the trial court erred in failing to instruct the jurors on punitive damages. Edgewood responds that Jackson waived this issue for review by failing to except to the instructions as given. We agree with Edgewood.

█ During the on-the-record discussions about Jackson's proposed verdict sheet, the trial court directed her attorney to change the verdict sheet to remove the two questions addressing punitive damages. Jackson's attorney replied, "That's right, Your Honor. I mean based on your previous ruling, [questions] 3 and 4 would no longer be appropriate." [17] The jurors subsequently were instructed with no mention of punitive damages. Having failed to except to the instructions, Jackson may not be heard to complain on appeal that the instructions as given were erroneous. Md. Rule 2–520(e) ("No

---

17. Counsel for both parties acknowledged during oral argument in this Court that the transcript of the trial in this matter does not contain any argument regarding Jackson's entitlement, *vel non,* to punitive damages. Jackson's attorney stated that it was his recollection that he argued for a jury instruction on punitive damages, which the trial court denied. Edgewood's attorney had a similar recollection. The omission of this argument from the transcript could not be explained, however. As Jackson's attorney candidly admitted he feared, the absence of any record of this argument inures to Jackson's detriment.

party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.").

**APRIL 23, 2012 AMENDED JUDGMENT VACATED; ORIGINAL JUDGMENT ENTERED OCTOBER 3, 2011, AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**