**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 16-2408**

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

       Plaintiff - Appellant,

v.

MARYLAND INSURANCE ADMINISTRATION,

       Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge.  (1:15-cv-01091-JFM)

Argued:  October 25, 2017                               Decided:  January 5, 2018

Before WILKINSON, KEENAN, and FLOYD, Circuit Judges.

Vacated and remanded by published opinion.  Judge Keenan wrote the majority opinion, in which Judge Floyd joined.  Judge Wilkinson wrote a dissenting opinion.

**ARGUED:** Philip Matthew Kovnat, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant.  John Van Lear Dorsey, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee. **ON BRIEF:** James L. Lee, Deputy General Counsel, Jennifer S. Goldstein, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Office of General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant.  Brian E. Frosh, Attorney General, Lisa Boylan Hall, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND,

Baltimore, Maryland, for Appellee.

BARBARA MILANO KEENAN, Circuit Judge:

The Equal Employment Opportunity Commission (the EEOC) brought this action on behalf of three female employees against their employer alleging salary discrimination under the Equal Pay Act (the EPA), 29 U.S.C. § 206(d). The district court granted summary judgment in favor of the employer, the Maryland Insurance Administration (MIA), and the EEOC appealed. Upon our review, we conclude that the EEOC established a prima facie violation of the EPA, and that genuine issues of material fact exist regarding whether the pay disparity was due to factors other than gender. We therefore vacate the district court's grant of summary judgment in favor of MIA and remand for further proceedings consistent with this opinion.

I.

A.

MIA is an independent state agency that performs various functions related to the regulation of Maryland's insurance industry and the enforcement of Maryland's insurance laws. Md. Code, Ins. §§ 2-101, 2-102. MIA is subject to the State Personnel Management System, a merit-based system, which establishes job categories based on the general nature of required duties and sets corresponding levels of compensation. Md. Code, State Pers. & Pens. §§ 6-102(1)(i), (2), (3). Although MIA, as an independent state agency, is given discretion to set its employees' salaries, MIA follows the hiring and salary practices of Maryland's Department of Budget and Management, which

3

promulgates a Standard Pay Plan Salary Schedule (the Standard Salary Schedule).  Md. Code, Ins. § 2-105.

In accordance with the Standard Salary Schedule, when a new employee is hired, MIA assigns that employee to a grade level matching the position being filled.  Each grade level carries an assigned base salary and a specific salary range consisting of 20 separate steps.  After designating a new employee's particular grade level, MIA assigns the new hire to an initial step placement based on prior work experience, relevant professional designations, and licenses or certifications.  In selecting a particular step level, MIA also considers the difficulty of recruiting for the position, and, under Maryland law, also awards a new employee credit for any prior years of service in state employment for the purposes of determining that employee's step in the applicable pay grade.  Md. Code, State Pers. & Pens. § 2-601.  Additionally, a Maryland government employee who transfers to a "lateral" position takes her assigned grade and step with her to the new position.

MIA employees work within one of six units, each comprising a different area of insurance regulation.  Md. Code, Ins. § 2-102.  At issue in this case is the Fraud Investigation Division.  Employees working in the Fraud Investigation Division, or Fraud Investigators, are charged with investigating allegations of criminal insurance fraud perpetrated by individuals.  Until July 2013, the Fraud Investigator position was classified at a grade 15 on the Standard Salary Schedule.  At that time, based on an internal job study conducted by MIA, the position was reclassified at grade 16.  Under the Standard Salary Plan, individuals hired as Fraud Investigators now are assigned to a

4

step within the grade 16 classification according to their qualifications and work experience.

MIA advertises minimum and preferred qualifications for the position of Fraud Investigator. To be minimally qualified for hire as a Fraud Investigator, an applicant must have five years of fraud investigatory experience in such areas as white collar crime, financial fraud, insurance fraud, and investigations conducted under the supervision of prosecutors or other attorneys. Preferred or desired qualifications for the position include designation as a Certified Fraud Examiner, as well as experience working with attorneys and participation in court or administrative hearings.

## B.

The EEOC brought the present action on behalf of three former MIA employees: Alexandra Cordaro, Marlene Green, and Mary Jo Rogers (collectively, the claimants). MIA hired Cordaro as a Fraud Investigator in December 2009. Cordaro had worked as a fraud investigator for a federal credit union for over two years, and as a criminal investigation and litigation paralegal for 12 years in the Baltimore County State's Attorney's Office. MIA assigned Cordaro to grade level 15, step four, with a starting salary of $43,495. By the time she resigned from her position at MIA about five years later, Cordaro was earning $49,916.

Marlene Green was hired as a Fraud Investigator in November 2010. Green held a bachelor's degree from Johns Hopkins University, and had more than 20 years of experience working for the Baltimore City Police Department. During the course of that employment, Green worked for approximately 13 years in an investigative capacity. In

5

the year immediately prior to joining MIA, Green worked as an investigator for the United States Office of Personnel Management and the Office of the State's Attorney for Baltimore County. MIA assigned Green to grade level 15, step four, with a starting salary of $43,759. By February 2013, when Green resigned from MIA, her salary was $45,503.

Mary Jo Rogers transferred to the Fraud Investigation Division from another position within MIA in July 2011. Rogers earlier had worked for eight years as a police officer and a detective with the Baltimore County Police Department. Immediately before being hired at MIA, Rogers worked for an insurance company as a special investigator and an adjuster. MIA assigned Rogers to grade level 15, step five, with a starting salary of $46,268. By November 2013, Rogers' salary was $50,300.

During their tenure at MIA, Cordaro, Rogers, and Green learned that their salaries were lower than the salaries of certain male Fraud Investigators. In early 2014, after unsuccessfully seeking to correct these disparities, Cordaro and Rogers filed complaints against MIA with the EEOC. It is unclear from the present record what transpired during the EEOC process.

The EEOC later filed the present lawsuit against MIA on behalf of the three claimants, alleging gender-based salary discrimination in violation of the EPA. During

6

the proceedings in the district court, the EEOC identified as comparators four male Fraud Investigators: Bruno Conticello, James Hurley, Donald Jacobs, and Homer Pennington.[1]

MIA hired Conticello as a Fraud Investigator in November 2010. Conticello held both a bachelor's and a master's degree in criminal justice, and had nearly 20 years of investigative experience working for various insurance companies and Maryland's Office of the Inspector General. He also had obtained a Certified Fraud Examiner designation.[2] MIA assigned Conticello to grade level 15, step 10, with a starting salary of $49,842. By late 2012, his salary was $51,561.

James Hurley was hired as a Fraud Investigator in November 2006. Hurley most recently had worked as an investigator with an underwriting insurance organization. He also had worked previously with MIA for a total of three years as a Fraud Investigator and as an investigator in MIA's property and casualty department. Altogether, Hurley had about 10 years of insurance-related investigative experience when he was re-hired at MIA in 2006. Hurley also had worked previously as a claim adjuster for several

---

[1] The EEOC also identified nine other male Fraud Investigators who earned higher starting wages than Cordaro, Green, and Rogers, but the EEOC did not designate these other employees as comparators. We focus our analysis only on the four Fraud Investigators specifically identified as comparators.

In addition, the EEOC identified as comparators two other males who work in a different unit within MIA, the Compliance and Enforcement Section, but who have similar job responsibilities as Fraud Investigators: Jeffrey Gross and Maurice Xenos. Because our disposition of this appeal does not rely on a determination whether these two individuals are valid comparators, we do not address their qualifications and starting salaries.

[2] The parties do not describe the particulars of the Certified Fraud Examiner designation, and the record does not provide any further information.

insurance companies, and had earned the designation of Certified Fraud Examiner. At the time of his most recent hiring at MIA, Hurley was assigned to grade 15, step six, with a starting salary of $45,298. By the time he left MIA in October 2012, Hurley's salary was $49,678.

MIA hired Donald Jacobs as a Fraud Investigator in May 2007. Jacobs had 11 years of experience as a Natural Resources Officer with the state of Maryland, primarily engaged in conducting marine patrols, and had worked for three years as an investigator in the Office of the Public Defender in Baltimore. This investigatory experience did not relate to fraud or white collar crime. Jacobs' starting salary at MIA was $45,298, based on his assignment to grade level 15, step six. When Jacobs left MIA in June 2010, his salary was $47,705.

Homer Pennington was hired as a Fraud Investigator in August 2007. Pennington had worked in the criminal investigation unit of the Baltimore Police Department for approximately 22 years before joining MIA. He earned the designation of Certified Arson Investigator, but neither his resume nor the record specify the requirements for acquiring this certification. Pennington was hired at grade level 15, step five, with a starting salary of $45,360. By May 2013, when Pennington left MIA, his salary was $47,194.

The parties filed cross-motions for summary judgment in the district court. The court denied the EEOC's motion and granted MIA's motion. In dismissing the EEOC's claim under the EPA, the district court effectively held that the claimants had failed to meet their prima facie evidentiary burden. The court concluded that the male Fraud

Investigators identified by the EEOC were not valid comparators because they were hired at higher steps than were the claimants. Alternatively, the court held that MIA had shown that the disparity in pay between the claimants and the male comparators was attributable to their relative experience and qualifications. The EEOC appeals the district court's grant of summary judgment to MIA.[3]

## II.

On appeal, the EEOC asserts that the district court erred in awarding summary judgment in favor of MIA. The EEOC argues that it made a prima facie showing of an EPA violation by identifying four male Fraud Investigators who earned higher starting salaries than the three claimants, who were assigned lower salaries than the male comparators despite performing identical work. In addition, the EEOC contends that MIA did not establish as a matter of law that the disparity in pay between the claimants and the male comparators was due to the comparators' credentials and prior work experience.

In response, MIA argues that the EEOC failed to identify valid comparators and, thus, did not make a prima facie showing of an EPA violation.[4] According to MIA, the

---

[3] The EEOC does not appeal the district court's denial of its motion for summary judgment. Rather, the EEOC contends only that the district court erred in granting summary judgment to MIA.

[4] We observe that MIA does not directly address the EEOC's argument that the four male Fraud Investigator comparators, who earned higher salaries than the claimants and performed identical work, comprise prima facie evidence of an EPA violation. As (Continued)

9

identified males were not valid comparators, because MIA hired them at higher steps on its pay scale than the steps to which the claimants were assigned. Alternatively, MIA argues that even if the EEOC made a prima facie showing of an EPA violation, MIA established as a matter of law that any pay disparity between the claimants and the comparators was based on gender-neutral reasons involving the comparators' prior experience and credentials that each claimant lacked. We disagree with MIA's arguments.

## A.

We review the district court's award of summary judgment de novo. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 716 (4th Cir. 2014). We consider the evidence and all inferences fairly drawn from the evidence in the light most favorable to the EEOC. *Carnell*, 745 F.3d at 716.

The EPA prohibits gender-based discrimination by employers resulting in unequal pay for equal work.[5] 29 U.S.C. § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). The plaintiff creates a presumption of discrimination under the EPA when she establishes a prima facie case. *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d

---

previously noted, MIA only challenges the male Enforcement Officers the EEOC identified as comparators, an issue that we need not reach in this appeal.

[5] The EPA is written in gender-neutral terms so that it is available to remedy discriminatory actions against both men and women. *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 350 n.32 (4th Cir. 1994).

336, 344 (4th Cir. 1994). We review the issue whether a plaintiff has made the required prima facie showing using a burden-shifting framework.[6] *Id.*; *see also Corning Glass*, 417 U.S. at 196.

A plaintiff establishes a prima facie case of discrimination under the EPA by demonstrating that (1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions. *Corning Glass*, 417 U.S. at 195. An EPA plaintiff need not prove that the employer acted with discriminatory intent to obtain a remedy under the statute. *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) (stating that the EPA "prescribes a form of strict liability"); *Sinclair v. Auto. Club of Okla., Inc.*, 733 F.2d 726, 729 (10th Cir. 1984).

Once a plaintiff has made the required prima facie showing, under the EPA, the burdens of production *and* persuasion shift to the defendant-employer to show that the wage differential was justified by one of four affirmative defenses listed in the statute. *Brinkley-Obu*, 36 F.3d at 344. These affirmative defenses are: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity

---

[6] The EPA burden-shifting framework is distinct from the *McDonnell Douglas* burden-shifting framework that we apply when reviewing claims brought under Title VII. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework proceeds in three steps in which the burden of persuasion remains with the plaintiff throughout the entire analysis. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

based on any factor other than gender. 29 U.S.C. § 206(d)(1); *Corning Glass*, 417 U.S. at 195. To avoid liability, the defendant must prove one of these four affirmative defenses. 29 U.S.C. § 206(d)(1); *Brinkley-Obu*, 36 F.3d at 344. Accordingly, if the employer fails to establish as a matter of law, for purposes of summary judgment, or to persuade a fact finder, that one or more affirmative defenses are applicable in a particular case, the plaintiff will prevail. *See Brinkley-Obu*, 36 F.3d at 344.

While an employer may be entitled to summary judgment on an EPA claim if the employer establishes an affirmative defense as a matter of law, the burden on the employer necessarily is a heavy one.[7] *See Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006); *Stanziale v. Jargowsky*, 200 F.3d 101, 107–08 (3d Cir. 2000). The EPA prohibits disparities in pay between men and women "except where such payment *is made pursuant to*" one of the four statutory affirmative defenses. 29 U.S.C. § 206(d)(1) (emphasis added).

We agree with the Third and Tenth Circuits' explanation that this statutory language requires that an employer submit evidence from which a reasonable factfinder could conclude not simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity. *See Stanziale*, 200 F.3d at 107–08; *Mickelson*, 460 F.3d at 1312 (quotation and citation omitted). Thus, because the employer in an EPA action bears the burden of ultimate

---

[7] In contrast, in a Title VII case, the employer need only proffer a legitimate, nondiscriminatory reason for the challenged action, and is not required to establish that the cited reason *in fact* motivated the employer's decision. *McDonnell Douglas*, 411 U.S. at 802.

persuasion, once the plaintiff has established a prima facie case the employer will not prevail at the summary judgment stage unless the employer proves its affirmative defense so convincingly that a rational jury could not have reached a contrary conclusion. *See Stanziale*, 200 F.3d at 108; *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 n.2 (8th Cir. 2003) ("At the summary judgment stage of the proceedings, the employer's justification for the differences is irrelevant, unless it is strong enough to establish one of the statutory affirmative defenses as a matter of law.").

## B.

We turn now to consider the issue whether the claimants made a prima face showing of discrimination under the EPA. To satisfy their burden, the claimants were required to show that (1) they were paid less than one or more males, for (2) performing work of substantially equal skill, effort, and responsibility, and that (3) such work was performed under similar working conditions. *Corning Glass*, 417 U.S. at 195. We hold that the claimants have made this required showing.

First, the record plainly establishes, and MIA does not dispute, that the claimants were paid less than the male comparators. Cordaro's and Green's respective starting salaries, of $43,495 and $43,759, were lower than the starting salaries of all four male comparators. Rogers' starting salary of $46,268 was lower than Conticello's starting salary of $49,842.[8]

---

[8] The fact that there were other male MIA employees hired at the same grade and step as the claimants at about the same time does not change our evaluation of the male comparators identified by the EEOC. The EPA does not dictate to a plaintiff what (Continued)

The record also shows that the claimants and the male comparators performed substantially equal work. It is undisputed that the claimants and the four male comparators each held the same position as Fraud Investigators. Though sharing a job title and a job description is not dispositive of this issue, *see Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 155 (3d Cir. 1985), nothing in the record suggests that the male Fraud Investigators performed work requiring skill, effort, or responsibility different from that required by the work performed by the female Fraud Investigators. Indeed, MIA affirmatively admitted before the district court that the claimants performed "identical job[s] as other Insurance Fraud Investigators."

The fact that other male employees at MIA performed substantially identical work but made less money than the claimants does not require us to reach a different conclusion. An EPA plaintiff is not required to demonstrate that males, as a class, are paid higher wages than females, as a class, but only that there is discrimination in pay against an employee with respect to one employee of the opposite sex. *See Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 161 (4th Cir. 1992) ("A female plaintiff bears the burden of proof of establishing a prima facie case by showing [among other things] that [ ] her employer pays her a lower wage than *a* male counterpart . . . ." (emphasis added)). The undisputed facts in the present record establish that each claimant earned

comparator she must choose, but requires only that, for the purposes of establishing a prima facie case, she choose a comparator of the opposite sex who performs substantially equal work for greater pay. 29 U.S.C. § 206(d); *see Corning Glass*, 417 U.S. at 195 (identifying the elements of an EPA prima facie case).

14

less than at least one male comparator performing substantially equal work. These undisputed facts alone satisfy the EEOC's prima facie burden.

Our conclusion is not altered by the fact that the male comparators were hired at higher step levels than at least one of the claimants, allegedly based on their background experience, relevant professional designations, and licenses or certifications. Such experience and other factors are relevant only to any affirmative defense asserted by MIA, not to the issue whether the EEOC has satisfied its prima facie burden. Instead, as we have explained, at this initial stage we ask only whether the claimants and the identified comparators worked jobs requiring "equal skill, effort, and responsibility," and whether each claimant was paid less than one or more comparators. *See* 29 U.S.C. § 206(d)(1); *Fowler*, 978 F.2d at 161. As both these requirements are met here, the EEOC has established a prima facie case of wage discrimination under the EPA.[9]

## C.

Because the claimants established a prima facie case of discrimination under the EPA, MIA was not entitled to summary judgment unless a rational jury could not have rejected MIA's proffered reasons for the wage disparities. *See Stanziale*, 200 F.3d at 107. Here, MIA asserts one affirmative defense, namely, that a factor other than the

---

[9] The dissent appears to take issue with Congress's determination of what constitutes a prima facie case of discrimination under the EPA. We are not free to disregard the policy choices made by Congress but, instead, must ensure that both private and public entities comply with the law as written.

15

comparators' gender justifies the wage disparity.[10] 29 U.S.C. § 206(d)(1). In support of this defense, MIA offers two allegedly gender-neutral reasons for the disparity: (1) MIA's use of the state's Standard Salary Schedule, which classifies each position to a grade level and assigns each new hire to a step within that grade level; and (2) the comparators' experience and qualifications. We conclude that MIA has not adduced evidence sufficient to require a factfinder to conclude that either of these two reasons actually occasioned the undisputed wage disparities.

MIA cannot shield itself from liability under the EPA solely because MIA uses the state's Standard Salary Schedule and awards credit for prior state employment or a lateral transfer within the state employment system. *See Brinkley-Obu*, 36 F.3d at 339 n.3, 340–41, 353 (rejecting an employer's argument that a jury verdict in the employee-plaintiff's favor should be reversed because of the employer's gender-neutral compensation system); *Aldrich v. Randoph Cent. Sch. Dist.*, 963 F.2d 520, 525 (2d Cir. 1992). Although the Standard Salary Schedule is facially neutral, MIA exercises discretion each time it assigns a new hire to a specific step and salary range based on its review of the hire's qualifications and experience. A fact finder faced with the present record could

---

[10] During the district court proceedings, MIA argued that its use of the Standard Salary Schedule constituted a "merit system" for purposes of establishing a merit-based defense under the EPA. *See* 29 U.S.C. § 206(d)(1). On appeal, however, MIA's brief focuses solely on the "factor other than sex" defense. We therefore do not address any merit-based defense argument previously raised because such argument has been abandoned. *See* Fed. R. App. P. 28(a)(6), (8) (stating that appellant's brief must contain the appellant's "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999).

have determined that, when exercising this discretion, MIA at least in part based its assignment of the claimants' step levels on their gender with a resulting diminution of their assigned starting salary. Therefore, while MIA uses a facially gender-neutral compensation system, MIA still must present evidence that the job-related distinctions underlying the salary plan, including prior state employment, *in fact* motivated MIA to place the claimants and the comparators on different steps of the pay scale at different starting salaries. *See Stanziale*, 200 F. 3d at 107–08.

MIA additionally argues that the pay disparities are justified by the difference between the experience and qualifications of the comparators and the claimants. As an example, MIA notes that Hurley and Conticello both earned Certified Fraud Examiner designations, which MIA had advertised as a preferred designation during the hiring process. Further, MIA observes that Hurley, Conticello, and Jacobs previously had worked for the state of Maryland, and that Pennington had over 20 years of law enforcement experience.

We agree that qualifications, certifications, and employment history fall within the scope of the fourth affirmative defense which, as stated above, encompasses "a differential based on any factor other than sex." 29 U.S.C. § 206(d)(1); *see, e.g.*, *Ritter v. Mount St. Mary's Coll.*, 814 F.2d 986, 993 (4th Cir. 1987). And, certainly, the factors cited by MIA *could* explain the wage disparity between the claimants and the comparators. Nevertheless, as we have emphasized, a viable affirmative defense under the EPA requires more than a showing that a factor other than sex *could* explain or *may*

17

explain the salary disparity. Instead, the EPA requires that a factor other than sex *in fact* explains the salary disparity.

The present record does not show, as a matter of law, that the reasons proffered by MIA do *in fact* explain the salary disparities. In particular, the record does not contain any contemporaneous evidence showing that the decisions to award Hurley, Jacobs, and Pennington their respective starting salaries were *in fact* made pursuant to their aforementioned qualifications. And, although there is some contemporaneous evidence regarding Conticello's hiring, this evidence is not sufficient to hold as a matter of law that his starting salary was assigned because of a factor other than sex. Although an official at MIA recommended that Conticello be hired at a higher starting salary than the typical investigator due to his prior experience, no evidence shows that the decision setting Conticello's salary was actually made on that basis.

Moreover, the claimants each had extensive prior investigative or law enforcement experience. At the very least, their prior experience is relevant to the position of Fraud Investigator and to the decisions fixing the claimants' starting salaries, and creates an issue of fact for the jury to decide whether MIA in fact objectively weighed the comparators' qualifications as being more significant than the claimants' qualifications.

For these reasons, we conclude that the district court erred in granting summary judgment in favor of MIA. Viewing the evidence in the light most favorable to the claimants, a jury would not be compelled to find that the reasons proffered by MIA were, in fact, the reasons for the disparity in pay awarded to the claimants and the comparators.

18

MIA's affirmative defense must be weighed by a finder of fact against the other evidence in the case.

## III.

For these reasons, we vacate the district court's order granting summary judgment to MIA, and remand the case for further proceedings consistent with this opinion.[11]

*VACATED AND REMANDEd*

---

[11] On remand, among other things, the district court should address in the first instance whether Green's claim is timely. *See* 29 U.S.C. § 255(a); *Nealon v. Stone*, 958 F.2d 584, 591 n.5, 593 (4th Cir. 1992).

WILKINSON, Circuit Judge, dissenting:

The majority refuses to so much as mention a state's sovereign interest in its own civil service. The place of state governments in our Republic has quite passed it by. Respect for states qua states fails to merit even the slight courtesies of lip service. The majority instead sounds a requiem of silence: states as constitutional entities have quietly expired.

And yet ours is not a Constitution of federal power only. The EEOC should not be able to bring a case as marginal as this one against a state. State workforces are highly regulated and regimented, and state law provides remedies for gender discrimination in all its forms. Simply put, state civil service systems are not hotbeds of gender bias, as this feeble suit makes all too clear.

I recognize that the EEOC is not acting in an adjudicative or regulatory capacity in this case. By bringing suit, though, the agency has consigned the state's sovereign interest in its own workforce wholly to the hands of federal authority. Here, a federal agency is bringing suit, the federal courts are deciding the suit, and federal law is providing the applicable rule of decision. In combination, this assertion of federal authority diminishes to an unacceptable extent the proper role of states in our constitutional system. Perhaps this federal takeover could be pardoned if this were a lawsuit of substance. But this is a thin, slight action.

Even if a federal statute can constitutionally be held to apply to the states, states can still utilize the Tenth Amendment to vindicate in litigation their constitutionally protected interests. At a very minimum, a case like this should not proceed to trial absent

20

clear and convincing evidence of the state's misconduct. The lax preponderance burden and summary judgment standard may be properly protective of a plaintiff's trial rights in most instances. But here they operate only to further subordinate a state's status.

For a federal agency to bring this tenuous case raises serious constitutional questions, and makes one wonder if Washington's overlords even know what dual sovereignty is all about. There are remedies for this kind of overreach, which I shall promptly address.

## I.

Ours is a federal system of government. It was carefully designed to strike a balance between the need for enumerated federal authority and respect for the residual sovereignty of the states. One half of that balance the majority now leaves wholly in shadow. In fact, the majority does not even hint that this suit raises the question of the extent to which Congress's power may constitutionally extend over state civil service systems. The answer to this question is fundamental to our constitutional structure, and it is one the Supreme Court has struggled with for decades.

## A.

For present purposes, our story begins with *National League of Cities v. Usery*, 426 U.S. 833 (1976), a case involving the Fair Labor Standards Act (FLSA). The FLSA initially covered only private employers and was upheld as a valid exercise of Congress's commerce power. *See United States v. Darby*, 312 U.S. 100, 115–16 (1941). Congress later amended it to also cover state employers. An assortment of states, cities, and their representatives challenged these amendments as unconstitutional. *See National League of*

21

*Cities*, 426 U.S. at 836–37. They argued that "our federal system of government imposes definite limits upon the authority of Congress to regulate the activities of the States as States by means of the commerce power." *Id*. at 842.

The Supreme Court agreed. It explained that Congress's commerce power, while broad, was nonetheless subject to distinct limitations. *Id.* at 841–43. One such limitation is the structure of our federal system as reflected in the Tenth Amendment's reservation of powers to the states. *Id.* at 842–43. The Court stressed that "the States as States stand on a quite different footing from an individual or a corporation when challenging the exercise of Congress' power to regulate commerce." *Id.* at 854. States are themselves "coordinate element[s] in the system established by the Framers for governing our Federal Union." *Id.* at 849. Allowing Congress to regulate "States in their capacities as sovereign governments" under the guise of the commerce power "would impair the States' 'ability to function effectively in a federal system.'" *Id.* at 852 (quoting *Fry v. United States*, 421 U.S. 542, 547 n.7 (1975)). For these reasons, the Court held that Congress lacked authority under the Commerce Clause to extend the FLSA's minimum-wage and overtime provisions to the States "in areas of traditional governmental functions." *Id.*

In *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), the Supreme Court by a 5–4 vote abandoned the project of limiting federal interference with traditional state functions. That case presented the question whether "municipal ownership and operation of a mass-transit system" was a "traditional governmental function." *Id.* at 530. Rather than answer this question, the majority opted to jettison the

22

entire inquiry. It reasoned that the task of identifying traditional governmental functions was "difficult, if not impossible" because the Court had been unable to craft a well-defined "organizing principle" in close to a decade. *Id.* at 539. And despite recognizing that Congress has only limited powers in our constitutional system, the majority determined that the Court had little role to play in enforcing those limits. It deemed the "basic limit on the federal commerce power" to be more properly policed through the "political process" and "state participation in federal governmental action" than in the courts. *Id.* at 556. Based on this analysis, the Court overruled *National League of Cities* and concluded that the FLSA could be constitutionally applied to state transit systems. *Id.* at 531, 554.

Justices Rehnquist and O'Connor in dissent predicted that, like the reign of *National League of Cities* before it, *Garcia*'s rule would be finite. Justice Rehnquist predicted that the vision of federalism espoused in *National League of Cities* would "in time again command the support of a majority of this Court." *Id.* at 580 (Rehnquist, J., dissenting). Justice O'Connor agreed. She forecast that the Court would "in time again assume its constitutional responsibility" for "oversee[ing] the Federal Government's compliance with its duty to respect the legitimate interests of the States." *Id.* at 581, 589 (O'Connor, J., dissenting).

True to these predictions, in the years since *Garcia*, the Supreme Court has proceeded to chip away at that case's underlying rationale. The Court has rejected discrete attempts at federal overreach and exhibited its commitment to protecting the place of states in the constitutional scheme. *See, e.g.*, *United States v. Morrison*, 529 U.S.

598, 617–19 (2000) (holding that the Violence Against Women Act's civil remedy for the victims of gender-motivated violence exceeded Congress's commerce power because regulation of "intrastate violence . . . has always been the province of the States"); *Alden v. Maine*, 527 U.S. 706, 754 (1999) (holding that the FLSA exceeded Congress's Article I powers by abrogating state sovereign immunity in state courts); *Printz v. United States*, 521 U.S. 898, 919, 933 (1997) (holding that the Brady Handgun Violence Prevention Act violated the Tenth Amendment by conscripting state law enforcement officers to perform background checks on prospective handgun purchasers); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71–73 (1996) (holding that the Indian Gaming Regulatory Act violated the Eleventh Amendment by abrogating state sovereign immunity in federal courts); *United States v. Lopez*, 514 U.S. 549, 564–68 (1995) (holding that the Gun-Free School Zones Act's prohibition on carrying firearms in school zones exceeded Congress's commerce power because it regulated a noneconomic activity in an area "where States historically have been sovereign"); *New York v. United States*, 505 U.S. 144, 177 (1992) (holding that the Low-Level Radioactive Waste Policy Act exceeded Congress's commerce power because it compelled states to regulate the disposal of radioactive waste according to Congress's instruction).

Overruling *Garcia* is not a step any court would take lightly. Nor is it one we are even empowered to take. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("[T]he Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). But it is not improper for us to observe that in the wake of *Garcia*, the states' corporeal interest in

24

our constitutional order has been left remarkably denuded. A state's right to manage its own workforce lies at the heart of this interest. This organic interest of the states differs from the more peripheral interests implicated by many of the abovementioned holdings. The organic interest of governments protects their ability to proceed as autonomous bodies on a day-to-day basis. Or, to use an indelicate phrase, it relates to the states' control over their own bodily functions.

To say that the sole constraints on federal oversight of state organic functions are political is to ignore centuries of growth in the sheer size of the federal government, centuries of expansion in the scope of federal control and areas of federal oversight, and centuries of experience with the appetite of one part of government to enhance its own power at another part's expense. Much of this federal growth was not only necessary but also salutary. Much of it helped to bind us economically as one nation and expand to all our most basic protections of civil rights and liberties. But applauding a development need not mean the loss of all sense of qualification and degree. The expanded federal role, for all its value, risks leaving states abandoned by the wayside. The concentration of federal power risks leaving liberty moribund and the vitality envisioned by the Framers dispiritingly inert. Instead of both checks and balances, we are now left with the prospect of irreversible centuries of neither.

## B.

The states' vulnerability to federal overreach is, as noted, alarming where their sovereign interests are at their zenith: in the management of their own workforces. States have passed extensive, gender-neutral regulations to govern their civil services. Such

25

regulations can and often do include state remedies to address gender discrimination in all of its forms: the matter of pay inequity has not gone unnoticed.

Maryland is no exception in this regard. Like the federal government, Maryland has its own Grade/Step system and its own Equal Pay for Equal Work Act, which prohibits "paying a wage to employees of one sex or gender identity at a rate less than the rate paid to employees of another sex or gender identity if both employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business, or of the same type." Md. Code, Lab. & Empl. § 3-304(b)(1). This prohibition expressly applies to government employers, including the state itself. *Id.* at § 3-301(b)(1). The Maryland legislature has also prohibited sex discrimination of all kinds in state employment, Md. Code, State Pers. & Pens. § 2-302(b)(1)(xi), and established an extensive Equal Employment Opportunity Program for civil servants that in many ways mirrors the federal EEOC, *id.* at § 5-201 to -215. These regulations both reflect the state's robust sovereign interest in this area and the utilization of that sovereign interest to achieve gender pay equity.

Maryland courts have hardly been reluctant to enforce these provisions, further obviating the need for unwarranted federal overreach. Indeed, Maryland courts have recognized that the EPA established only "a baseline rule" that states may and do supplement in promoting pay equity, meriting robust enforcement of Maryland's Equal Pay for Equal Work Act. *Gaskins v. Marshall Craft Assocs., Inc.*, 678 A.2d 615, 618–20 (Md. Ct. Spec. App. 1996). Other examples of Maryland courts enforcing employment discrimination laws are simply too numerous to list, but even a brief sampling illustrates

26

the state's willingness to take seriously these claims. *See, e.g., Manikhi v. Mass Transit Admin.*, 758 A.2d 95 (Md. 2000) (finding that a state government employee had a valid claim for a hostile work environment based on sexual harassment); *Molesworth v. Brandon*, 672 A.2d 608 (Md. 1996) (reinstating a jury verdict finding wrongful discharge based on sex discrimination); *Edgewood Mgmt. Corp. v. Jackson*, 66 A.3d 1152 (Md. Ct. Spec. App. 2013) (upholding jury damages award to plaintiff alleging she was terminated on the basis of her sex). The active partnership between Maryland's legislature and courts reflects a healthy state system, not a hive of discrimination in need of a federal agency's intrusion.

And so the question thus arises: does the disregard of the Tenth Amendment and the disparagement of our federal system lead to a debilitating duplicativeness in law that brings but limited public benefit? One need not—and indeed, may not—go so far as to revive *National League of Cities* to correct what has become a gross constitutional imbalance. But it does no violence to *Garcia* to require that when a federal agency seeks to supervise through litigation a state's management of its own workforce, it must make a clear and convincing case for doing so rather than proceeding under the preponderance of the evidence threshold. This clear and convincing standard is a workable approach that would serve to screen out deprivations of state sovereignty for trivial purposes, while leaving serious problems open to the corrective of federal law. Steering this middle course would restore for state governments in this narrow and discrete area of paramount state interest some of the constitutional protection of which they have been inexcusably deprived.

27

## II.

## A.

Violations of the EPA require that the employer have "discriminate[d] . . . between employees on the basis of sex." 29 U.S.C. § 206(d)(1). Therefore, there is no violation under the EPA if the salaries paid to employees are "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on *any other factor other than sex*." *Id.* (emphasis added). The so-called disparities in pay identified by the EEOC here are all easily explained by neutral factors unrelated to gender, and these explanations are not in genuine dispute.

The majority contends that "the burden on the employer necessarily is a heavy one," Majority at 11, conveniently overlooking the fact that not just one, but no fewer than four affirmative defenses were provided by Congress in the statute. They were provided for a reason, namely to prevent courts from reshuffling gender-neutral salary structures to suit their policy preferences. And while the burden to establish an affirmative defense rests with the one raising it, the ultimate burden of proof almost always rests with "the party seeking relief." *Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005).

The majority gets wound up in the question of a prima facie case, *see* Majority at 14 n.9, but the question here is whether there is an issue of triable fact regarding the state's alleged pay inequity. The civil rights statutes of course all have shifting proof schemes. But the Supreme Court has cautioned that there is a danger in an appellate court

getting wrapped around the axle of a proof scheme, which serves basically as a vehicle for the orderly presentation of evidence before the district courts. *See U.S.P.S. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). In fact, the Court has emphasized that we should not "treat discrimination differently from other ultimate questions of fact" or otherwise "evade[] the ultimate question of discrimination *vel non*." *Id.* at 714–16. On that ultimate question, plaintiffs, as noted, bear the burden. And a modest respect for state prerogatives with regard to the management of their own workforces requires that the quantum of evidence needed to satisfy that burden must be a clear and convincing one. Any diluted standard brings the Tenth Amendment and residual state authority under our Constitution up short.

In discussing the elements of a prima facie case, the majority quite overlooks the fact that a state's interest comes in by way of a Tenth Amendment defense, which it does not surrender even in those instances where a statute may be constitutionally applied to it. Regardless, this case is so weak that it would falter even on the permissive terms the majority has set for it. As the district court recognized, summary judgment was appropriate in these circumstances. Its decision must be affirmed.

B.

The differences in pay identified by the EEOC are all readily explainable by state policies crediting prior state employment and by differences in the experience and qualifications of the individuals involved. There is no dispute that each of these explanations is a neutral factor unrelated to sex. States, which have a clear interest in serving their citizens well, may legitimately design a workforce composed of qualified

29

individuals best able to deliver superior service. States are able to attract and retain such a workforce by tailoring their compensation schemes to the experience and credentials of the people they hire. The proposition is so obvious that to state it risks embarrassment.

With respect to the case at hand, it is important for an insurance agency to be staffed by people who are specialized in the types of claims typical of that agency's work. Because the majority skims over the relevant differences among the employees, I describe each of the state's justifications for its employees' salaries in turn.[1]

The state of Maryland has an overarching policy of rewarding dedicated civil servants by ensuring that their salaries reflect their years of state employment. First, Maryland law governing lateral transfers authorizes officials to freely reassign state employees to "another position of equal grade and service." Md. Code, State Pers. & Pens. § 7-602(a)(1). By contrast, the State Personnel and Pensions Code provides for reassignment to a "position of a lower grade in any unit" only when an employee "appl[ies] for a voluntary demotion." *Id.* at § 7-602(c)(1). The record reflects that MIA applied these laws in a neutral manner to employees hired as lateral transfers, assigning them to grades and salaries equivalent to those held in their prior positions. Mary Jo

---

[1] In EPA cases, an employee alleging wage discrimination (a "complainant") must show that her pay is lower than that of a fellow employee (a "comparator") who performs "work substantially equal in skill, effort and responsibility under similar working conditions." *Strag v. Board of Trs.*, 55 F.3d 943, 948 (4th Cir. 1995). This case involves three complainants (Mary Jo Rogers, Marlene Green, and Alexandra Cordaro) and six comparators (Bruno Conticello, Jay Hurley, Donald Jacobs, Homer Pennington, Jeffrey Gross, and Maurice Xenos). The parties dispute whether Gross and Xenos are valid comparators, and neither the majority nor I decide this question. However, I address their qualifications to demonstrate that summary judgment is appropriate regardless.

Rogers, one of the complainants, was informed of her new position in MIA in a letter explaining: "Since this is a lateral transfer, your classification will remain . . . Grade 15 step 5 which equates to an annualized salary $ 47,018." J.A. 92. Similarly, when the Associate Commissioner of the Insurance Fraud Division, Carolyn Henneman, recommended hiring Bruno Conticello, one of the comparators, her letter to the HR Director noted that he would need to be "offered a somewhat higher salary than the typical line investigator" in part because he was "already being paid significantly higher than that line salary" at his prior state job. J.A. 328.

Maryland law also required MIA to take prior state employment into account in setting salaries in other ways. For example, former employees who are reinstated in the civil service are entitled to "receive credit for time employed before separation" when they are assigned to a pay grade. Md. Code, State Pers. & Pens. § 2-601(c)(1). And Maryland employees transferring from a contract position to a budgeted position within the same principal unit "shall be given credit for service in the contractual position for the purpose of establishing" their pay grade. *Id.* at § 13-304.

The complainants and the comparators were not similarly situated with respect to prior state employment. Rogers was the only complainant who was already employed by the state when she was hired as a Fraud Investigator. By contrast, among the comparators, Bruno Conticello, Maurice Xenos, and Jeffrey Gross were all employed by the state at the time they were hired as budgeted Fraud Investigators or Enforcement Officers. As noted above, Conticello's salary reflected his lateral transfer. Xenos and Gross were both hired after acting as contract employees, and they were therefore

statutorily entitled to credit for that time under § 13-304. Comparators Hurley and Jacobs were not employed by the state at the time they were hired, but the EEOC acknowledges that they nonetheless had creditable prior state work experience, affecting their starting salaries. EEOC Reply Br. 25.

Differences in the extent of creditable prior state employment thus explain much of the variation in salaries among both the male and female employees: The EEOC does not dispute that, among the complainants, only Rogers had prior state work experience at least equivalent to that of Conticello, Hurley, or Jacobs. And, predictably enough, Rogers was more highly compensated than the other two complainants. Not only that, she was given a higher starting salary than either Hurley or Jacobs.

Of course, prior state employment was not the only factor involved in setting starting salaries at MIA. Beyond prior state employment, there were also important differences in the qualifications and credentials of the complainants and comparators. Comparators Conticello and Hurley were both Certified Fraud Examiners, and Gross held an insurance producer (agent) license, credentials none of the complainants had achieved. Comparator Pennington had training from the National Fire Academy on arson investigations, highly relevant training in the insurance field that none of the complainants had. Xenos had a special expertise in title insurance, allowing him to serve a role at MIA that none of the complainants could have served. All of these credentials, held by the comparators and not by any of the complainants, are indisputably relevant to the work of MIA. And while all of the employees had at least some relevant experience, not all of the employees had equal prior experience. For example, comparator Pennington

32

had thirty years of experience in law enforcement, more than any of the complainants. These are important components of MIA's mission, and expertise in these matters on the part of MIA employees is preferred.

For each comparator, then, the salary assigned by MIA is explained by prior state experience, specialized credentials, other exceptional work experience, or a combination of these factors. Conticello's salary was based on matching his prior salary after he laterally transferred into MIA, and is additionally justified by his Certified Fraud Examiner qualification. Xenos's and Gross's salaries were enhanced by their creditable prior state employment and their abovementioned specialized expertise. Comparators Hurley, Jacobs, and Pennington all had lower starting salaries than complainant Rogers, and they made more than complainants Green and Cordaro based on the creditable prior state employment of Hurley and Jacobs, Hurley's Certified Fraud Examiner qualification, and Pennington's arson training and lengthy law enforcement experience. Gender is not required to understand any of these decisions.

These conclusions are further bolstered by looking to the salaries of other MIA employees. While the EEOC identifies a number of men who were paid more than Cordaro, the lowest-paid complainant, it ignores the numerous examples of men who were paid the same amount or less than she was paid. Michael Stefanowitz and Thomas Bradford were each hired at lower starting salaries than Cordaro's. Todd Young, a Fraud Investigator at MIA, started prior to Cordaro, and with a higher starting salary. But his salary was later reduced by the same temporary salary reduction that affected Cordaro's starting salary, so at the time she was hired, they had identical salaries. Following a

33

reclassification of all Fraud Investigators to a higher compensation grade in 2013, Cordaro's compensation was identical to the male Fraud Investigators Williams Johns, Thomas Zanfardino, and Edward Spragg. And notably, the record indicates that the highest starting salary offered to any new Fraud Investigator during the relevant period was $51,809, an amount offered to both Mark Bilger, a man, and Novia Maduro, a woman. The overall salary history of the department, then, strengthens the impression given by examining only the complainants and comparators: MIA assigned salaries based on an individualized assessment of each new employee, not based on gender.

Given the large number of individuals involved here and the variation in each individual's background, it is easy to become focused on minutiae in this case. When considered together, though, the brushstrokes of each salary decision paint a clear picture of a state agency taking valid factors unrelated to gender into account when setting salaries. MIA necessarily took prior state employment into account: the comparators had more creditable state employment history than the complainants. MIA took expertise and relevant experience into account: the comparators had more credentials and relevant experience than the complainants. These straightforward explanations are more than sufficient to foreclose an EPA claim against the agency. The majority says the question is whether these explanations "in fact" explain the differentials as opposed to whether they "could." Majority at 11. And the majority is certainly correct that discriminatory intent is not required in an EPA action. *Id.* at 10. But the explanations provided by the MIA do *in fact* explain the differentials in this case. Therefore, summary judgment in favor of MIA was appropriate in this case, even on the majority's own terms.

34

III.

I return briefly to where I began. The majority treats the state of Maryland as just any ole defendant, and that is not right. States are not mere abstract entities reserved for civics lectures. They discharge important tasks of governance and they house human heartbeats. The Framers made them a significant part of our constitutional architecture, which the majority has no right to dismantle.

The majority has now allowed a federal agency possessed of no more than a transparently thin and insubstantial case to abrogate a state's interest in managing its own workforce. It is foundational to both our civil and our criminal justice systems that the ultimate burden resides with the party bringing suit. How much more must this be the case when the most basic ingredients of state autonomy are implicated. The structure of our Constitution—adumbrated specifically in the Tenth Amendment but infused throughout that document—would seemingly require that pretrial dismissals be more, rather than less, available to state governments attempting to vindicate the place that the Constitution has assigned to them. The intrusion here is not justified by the evidence, under the law, or by the state's weighty interest in managing its own employees. Requiring a federal agency to meet its ultimate burden here by clear and convincing evidence, not a mere preponderance, would seem one modest step in restoring the dignity of our fifty states in the constitutional design. The clear and convincing standard allows the federal government to proceed in every case of real wrongdoing while deterring the assertion of federal authority in less-than-marginal instances such as this. Because the

35

majority decision diminishes the rightful place of our states in every way conceivable or possible, I respectfully dissent.